**JONES TRUCK LINES, INC., Debtor–In–Possession, Plaintiff,**

v.

**AFCO STEEL, INC., Defendant.**

No. LR–C–93–411.

United States District Court, E.D. Arkansas, W.D.

March 17, 1994.

---

Charles Coleman of Wright, Lindsey and Jennings Law Firm, Little Rock, AR, for plaintiff.

Henry Kinslow, El Dorado, AR, for defendant.

## MEMORANDUM OPINION AND ORDER

WILSON, District Judge.

Defendant, AFCO Steel, Inc., has filed motions for referral to the Interstate Commerce Commission (ICC), and to stay this action pending referral to the ICC. For the reasons set forth below, the motions will be granted.

Jones Truck Lines, Inc., plaintiff, is an Arkansas transportation company that is now in Chapter 11 bankruptcy proceedings. Plaintiff brought this action under the Interstate Commerce Act to collect $13,180.33, which it claims constitutes the difference between the tariff rate Jones had on file with the ICC and the negotiated rate actually billed for freight shipments in 1988–1989. As other courts have noted in similar cases, this action is one among many cases filed by plaintiff against shippers in an effort to recover "undercharges" for freight carried by Jones Truck Lines. *Jones Truck Lines, Inc., Debtor-in-Possession v. Hillcrest Camshaft Service, Inc.*, LR–C–93–408, 1993 WL 666696 (E.D.Ark., Amended Memorandum and Order, January, 1994); *Jones Truck Lines, Inc., Debtor-in-Possession v. ASCO Hard-ware, Inc.*, LR–C–93–459, 1993 WL 261005 (E.D.Ark., March, 1994). Plaintiff contends that it operated as a motor common carrier when it moved defendant's freight and is entitled to the filed tariff rate under the "filed rate doctrine." Under the filed rate doctrine, a motor common carrier is prohibited by statute from charging or receiving different compensation for transportation than the tariff filed with the ICC. 49 U.S.C. 10761(a). By contrast, a "motor contract carrier" is exempt from the filed rate doctrine. Defendant answers that plaintiff transported the freight based on a carriage contract, that defendant paid the amounts required under that contract, and that Jones is not entitled to the filed tariff rate. AFCO Steel further contends that even if plaintiff had acted as a motor common carrier, Jones' tariff rates and practices are unreasonable and thus unenforceable. If the transportation in this case is held to be contract carriage, AFCO will prevail.[1] If it is held to be common carriage, the case will be decided by ruling on the "reasonableness" of Jones' rates and practices. *Hillcrest*, supra, at 2–3. Plaintiff alleges that defendant has not made the prerequisite showing of rate unreasonableness needed for referral to the ICC.

Defendant contends that the shipments involved in this case were moved under contract rate and were therefore not subject to any tariff filing requirements, and that the Negotiated Rates Act of 1993 (NRA) requires this issue to be referred to the ICC. The Court will summarize the relevant statutory provisions. In December, 1993, President Clinton signed into law the Negotiated

---

1. A motor carrier acts either as a motor common carrier or a motor contract carrier. As noted above, a contract carrier is exempt from the filed rate doctrine. The definition of a motor contract carrier in the Interstate Commerce Act is:

   A person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons—

   (i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or

   (ii) designed to meet the distinct needs of each such person. 49 U.S.C. 10102(15)(B) (1988).

   So, contract carriage is designed for the exclusive use of the subscriber or is designed to meet its distinct needs. The ICC applies a "totality of circumstances" test in resolving issues regarding the type of carriage: "It is the totality of circumstances surrounding any particular movement, not the presence or absence of a written contract, that determines whether the transportation is contract carriage." *Contracts for Transportation of Property*, 8 ICC 2d 520 (1992); *Jones Truck Lines, Inc., Debtor-in-Possession v. Hillcrest Camshaft Service*, LR–C–93–408, (E.D.Ark., Amended Memorandum and Order, January, 1994, at 3–4). Federal courts have frequently emphasized the ICC's jurisdiction to decide the issue of contract or common carriage: "The ICC has stated repeatedly that it has primary jurisdiction to determine whether transportation subject to its regulation is contract carriage or common carriage." *F.P. Corp. v. Ken Way Transport., Inc.*, 821 F.Supp. 1032, 1035 (E.D.Pa., 1993).

Rates Act of 1993 (NRA). Section 8 of the NRA provides:

Section 11101 of Title 49, United States Code, is amended by adding at the end the following:

(d) RESOLUTION OF DISPUTES RELATING TO CONTRACT OR COMMON CARRIER CAPACITIES.—If a motor carrier (other than a motor carrier providing transportation of household goods) subject to the jurisdiction of the Commission under subchapter II of Chapter 105 of this title has authority to provide transportation as both a motor common carrier and a motor contract carrier and a dispute arises as to whether certain transportation is provided in its common carrier or contract carrier capacity and the parties are not able to resolve the dispute consensually, the Commission shall have jurisdiction to, and shall, resolve the dispute.

■ Plaintiff alleges that Section 9 of the NRA in combination with 11 U.S.C. 541(c)(1) indicate that the NRA is not applicable to this case. Plaintiff asserts that the Bankruptcy Code prevents non-bankruptcy laws from causing a forfeiture of the debtor's property (the undercharge claim is the "property" in this case) based on the debtor's financial condition. "The NRA's anti-undercharge provisions are conditioned," plaintiff contends, "on the financial condition of the debtor within the meaning of Section 541 because they only apply to bankrupt and other carriers that have ceased operation." Section 9 of the NRA provides:

Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting application of Title 11, United States Code, relating to bankruptcy; Title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974.

The other relevant provision cited by plaintiff, 11 U.S.C. 541(c)(1), states:

Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—

(A) that restricts or conditions transfer of such interest by the debtor; or

(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title [11 U.S.C.S. 101 et seq.] or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

After an examination of the statutory language and legislative history surrounding the passage of Section 9 and of the NRA as a whole, the Court does not accept plaintiff's construction of the NRA. The Court concludes that the basic reason for Congress' passage of the NRA was to address the problem that trustees for bankrupt carriers were pressing businesses all across the country for payments on shipments made years before. The Court is in agreement with the analysis of the NRA presented by Judge Hendren in *Jones Truck Lines, Inc., Debtor-in-Possession v. Alliance Rubber Company*, 166 B.R. 691 (W.D.Arkansas, 1994). The NRA was clearly a response to claims made by trustees for bankrupt motor carriers. *Alliance Rubber Company*, supra, at 1298. In the hearings of the House Subcommittee on Surface Transportation on this legislation, there was extensive discussion of problems caused by undercharge claims asserted by trustees of bankrupt motor carriers; Representative Jennifer Dunn, a co-sponsor of the bill that ultimately became the NRA, stated that it addressed the "legal morass where bankrupt trucking companies are suing businesses, large and small." *Hearing on the Negotiated Rates Issue and Proposed Legislative Solutions Thereto Before the House Subcommittee on Surface Transportation of the Committee on Public Works and Transportation*, 103rd Congress, 1st Sess., at 120 (June 15, 1993). Statements made by Members of Congress during debate on the bill reflected their concern about the damage the undercharge crisis inflicted on the national economy. Representative Shuster stated that the undercharge dilemma "stifles our economy and caused the failure of many businesses and the loss of jobs." 139 Cong.Rec. H9596. Similarly, Representative Hutchinson warned that "The threat of undercharge

claims is like a cancer in the transportation industry and discourages shippers from using common carriers in order to avoid potential liability." 139 Cong.Rec. H9599.

The Senate Report on the bill stated that its purpose was to alleviate the "freight motor carrier undercharge litigation crisis" and resolve disputes "resulting from efforts by trustees for bankrupt motor carriers or non-household goods forwarders to collect additional amounts for past transportation provided, in certain instances where the agreed-upon rate or charge allegedly was not properly or timely filed in a tariff with the ICC ..." *Senate Report No. 103–79*, June 29, 1993 (1993 WL 241281). The Nov. 15, 1993 House Report on the bill stated that "Section 8 amends Section 11101 of Title 49 U.S.C. by adding a provision which gives the ICC the authority to resolve disputes on whether a carrier's service was contract or common carriage where the carrier holds authority to operate in either capacity." *House Report No. 103–359*, Nov. 15, 1993, U.S.Code Cong. & Admin.News 1993, 2534, 2535 (1993 WL 474910). In its general description of the litigation crisis, the House Report observed:

The Motor Carrier Act of 1980 (MCA) revised national transportation policy by encouraging an extremely competitive environment in the motor carrier industry. In light of this new policy, the ICC changed tariff filing regulations to permit tariff rate reductions on one day's notice and to allow carriers to establish rates for named shippers.

Today, it is common practice for carriers and shippers to negotiate individual rates for particular transportation services. Difficulties arise, however, when motor carriers fail to properly file the negotiated rate with the ICC or when certain conditions trigger tariff provisions cancelling tariff discounts. If a motor carrier ceases operation and files for bankruptcy, the receiver or trustee frequently retains an auditor to search the records of the carrier for instances in which the rates billed and collected were lower than the applicable rates on file at the ICC. When these discrepancies are discovered, the receiver or trustee then files a collection action to recover the difference from the shipper. The shipper most often refuses to pay the claim, on the grounds that the shipper and the carrier had a valid agreement by which they both agreed to the lower rate, and any obligation to file the tariff was the carrier's, therefore, it is not right for the shipper to now be penalized for the carrier's failure to file. Protracted litigation has often resulted. Rising numbers of motor carrier bankruptcies in recent years led to a large number of negotiated rates collection actions. Estimates of amounts involved range from $200 million in 1990 to several billion dollars today, with the ICC estimate at $32 billion.

Senator Hollings, as chair of the Committee on Commerce, Science and Transportation explained in debate on final passage of the NRA—after the House of Representatives passed it on Nov. 15, 1993—that it constituted a bipartisan consensus developed to address the "undercharge litigation crisis." 139 Cong.Rec. S16183–01. Hollings observed that "As the Commerce Committee has recognized for some time, the undercharge crisis reflects a broad spectrum of efforts by trustees for bankrupt motor carriers to collect from shippers additional payments for shipments which moved and were paid for long ago." *Id.* The chairman stressed that while he was aware of problems associated with the demands of other creditors, drivers of bankrupt trucking companies seeking unpaid wages, and other problems, the sponsors of the legislation had concluded that the "continually escalating undercharge litigation and collection spiral serves no useful purpose, and makes clear the long overdue need for a legislative solution to this problem." *Id.*

Senator Danforth, another leading sponsor of the legislation, echoed Hollings' explanation of the bill in the final debate. Noting that the total value of the claims in these cases across the country has been estimated as at least several billion dollars, Danforth observed that the beneficiaries are not creditors or pension funds of the bankrupt carriers, since the ICC has concluded that between 55 and 80 percent of the proceeds would go for legal fees and collection agents. In summarizing the reasons behind passage of the bill, Danforth stated:

Mr. President, today we finally bring to an end an expensive nuisance for America's businesses that has resulted from the continued enforcement of outdated laws. Last fall, 60 Minutes ran a story entitled 'You're kidding.' This story involved interviews with small businessmen hit with large freight bills related to shipments for which they had paid years ago. These shippers were asking how this could happen.

The answer requires a review of the law governing motor carriers' movement of freight. The Motor Carrier Act of 1980 substantially deregulated the trucking industry by eliminating most price and entry requirements. One significant regulation retained was the requirement that trucking companies filed with the ICC all tariffs governing shipments. Since enactment of the 1980 Act, however, carriers have frequently negotiated lower rates with shippers but have not filed those rates with the ICC. In 1990, the Supreme Court in *Maislin Industries v. Primary Steel,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) held that shippers are required to pay the filed rate when the shipper and carrier have privately negotiated a lower rate, regardless of the equities involved. The trustees of bankrupt trucking companies that had negotiated such rates are now suing shippers for the difference. These suits are being brought years after payment for and delivery of the shipments.

Let me use a hypothetical to illustrate the absurdity of this situation. In my example, you bought a discounted airline ticket from Pan Am several years ago for $300. Subsequently, Pan Am liquidates. Pan Am's bankruptcy trustee notifies you that the nondiscounted price of the ticket you purchased was $600. The trustee says that Pan Am was supposed to file the discounted ticket price, $300, with a government agency, but he failed to do so. Thus, Pan Am's trustee says that you owe the difference between the agreed upon price and nondiscounted fare. The bottom line is that those who are suffering are the ones who made a deal and fulfilled their obligations ... ·

The legislation also preserves a shipper's right to pursue an ICC determination of the reasonableness of the rate charged, if a shipper elects not to use the settlement formulas. It also eliminates lawsuits that bankruptcy trustees have brought to collect money from shippers related to code and range tariffs. *Id.*

■ The parties to this action obviously disagree as· to whether there was a valid contract and whether the plaintiff transported the goods in question under its contract carrier authority or common carrier authority. The Court concurs with the assessment of Judge Hendren: "The Court recognizes the apparent conflict between the language of the bankruptcy statute quoted above and the legislative history of the NRA but believes one of the main purposes of the NRA was to make an impact on the number of lawsuits brought by trustees in their capacities as representatives of bankrupt estates." (*Jones Truck Lines v. Alliance Rubber Company,* supra, at 1299).[2] The relevant NRA provision states that if a dispute arises as to whether certain transportation "is provided in its common carrier or contract carrier capacity and the parties are not able to resolve the dispute consensually, the Commission shall have jurisdiction to, and shall, resolve the dispute." 49 U.S.C. 11101. Therefore, the Court hereby refers to the ICC the issues of whether there was a valid contract and whether plaintiff transported the goods in question under its contract carrier authority or common carrier authority. The Court also finds it appropriate to refer to the ICC the other issues stated in defendant's motion to refer.

Under the NRA, small businesses are exempt from paying undercharge claims of the type frequently found in the current litigation logjam. The affidavit of Victor Cobb,

---

2. The Court is aware that United States Bankruptcy Judge Marvin Wooten of North Carolina does not concur with the construction of the NRA presented in this order and in the orders of Judge Reasoner in the Eastern District of Arkansas and Judge Hendren of the Western District of Arkansas. For the reasons stated in this opinion, the Court differs from Judge Wooten's view (in *Langdon M. Cooper, Trustee for Bulldog Trucking, Inc., v. E.I. Du Pont De Nemours & Co.,* U.S. Bankruptcy Court, .W.D. North Carolina, Charlotte Division, Feb. 18, 1994 (C–B–90–31936), 1994 WL 197420 and agrees with Judges Hendren and Reasoner.

AFCO's controller, alleges that defendant is a small business under the standards of the Small Business Administration. Since the Court is granting the motion for referral to the ICC, the cross motions for summary judgment and other pending motions are now moot in this case; however, the Court notes that the small business exemption section of the NRA again underscores the Congressional concern with the problems of bankrupt carriers bringing under charge claims. The NRA's legislative history indicates that it was intended to exempt small business from these claims. As Senator Danforth stressed, "The *Maislin* case has placed a heavy burden on many of our nation's small businesses. In some instances, these suits are causing small businesses to enter bankruptcy." 139 Cong.Rec. S16183–01, 1993 WL 478679. The bill provided formulas for settling these disputes: claims relating to truckload shipments could be settled by paying 15 percent of the claimed undercharge, claims relating to less than truckload shipments could be settled by paying 20 percent of the claimed undercharge. Furthermore, as Danforth explained in the final debate, "the legislation makes a distinction on the basis of the size of the shipper, totally exempting small shippers from undercharge claims." *Id.* The relevant statutory language states: "A person from whom the additional legally applicable and effective tariff rate or charges are sought shall not be liable for the difference between the carrier's applicable and effective tariff rate and the rate originally billed and paid—(A) if such person qualifies as a small-business concern under the Small Business Act. (15 U.S.C. 631 et seq.)"

The NRA effectively reversed the *Maislin* decision on the issue of claims involving rates on shipments prior to September 30, 1990, as the Act provides that unreasonable practices are a valid affirmative defense for these claims. *Hillcrest,* supra, at 9. In *Maislin,* the Court had dealt with two of the shippers' standard defenses in these undercharge actions: first, the defense that the carrier's attempt to collect more than the agreed-upon rates is an "unreasonable practice" proscribed by the Interstate Commerce Act, and second, that the tariff rates were unlawful because they were unreasonably high. *Maislin Industries v. Primary Steel,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990); *Reiter v. Cooper,* —— U.S. ——, ——, 113 S.Ct. 1213, 1216, 122 L.Ed.2d 604 (1993). *Maislin* eliminated the shippers' "unreasonable practice" defense, stating that it would "render nugatory" the specific command of the ICA that the carrier charge the filed rate. *Maislin,* at 133, 110 S.Ct. at 2769. However, the Court "expressly noted that the issue of the reasonableness of the tariff rates is open for exploration on remand." *Id.* Hence, *Maislin* overturned a policy adopted by the ICC of determining this pattern of conduct culminating in the effort to collect undercharges as an "unreasonable practice," but the ICC could still inquire into whether the particular rate charged was reasonable or not. The relevant provision of the NRA on point is Section 2(e):

(e) ALTERNATIVE PROCEDURE FOR RESOLVING DISPUTES.—(1) GENERAL RULE.—For purposes of Section 10701 of Title 49, United States Code, it shall be an unreasonable practice for a motor carrier of property (other than a household goods freight forwarder), or a party representing such a carrier or freight forwarder to attempt to charge or to charge for a transportation service provided before September 30, 1990, the difference between the applicable rate that is lawfully in effect pursuant to a tariff that is filed in accordance with Chapter 107 of such title by the carrier or freight forwarder applicable to such transportation service and the negotiated rate for such transportation service if the carrier or freight forwarder is no longer transporting property between places described in Section 10521(a)(1) of such title or is transporting property between places described in Section 10521(a)(1) of such title for the purpose of avoiding the application of this subsection.

(2) JURISDICTION OF COMMISSION.—The Commission shall have jurisdiction to make a determination of whether or not attempting to charge or the charging of a rate by a motor carrier or freight forwarder or party representing a motor carrier or freight forwarder is an unreasonable practice under paragraph (1). If the Commission determines that attempt-

ing to charge or the charging of the rate is an unreasonable practice under paragraph (1), the carrier, freight forwarder, or party may not collect the difference described in paragraph (1) between the applicable rate and the negotiated rate for the transportation service.

It is a fact that Jones Truck Lines is no longer transporting property. Hence, as a result of the NRA, the ICC has jurisdiction to determine if the plaintiff's conduct was an "unreasonable practice," as well as the issue of whether the rates attempted to be charged were reasonable. *Hillcrest,* at 10.

■ The Court relies upon the NRA as a sufficient basis for referring this matter to the ICC. However, the Court also notes that many other courts relied upon case law before the NRA's passage to arrive at a conclusion supporting referral in similar cases (although there was a split among the courts on these issues, it should be acknowledged.) For example, in his original opinion in *Jones Truck Lines, Inc. v. Hillcrest Camshaft Services, Inc.,* LR–C–93–408, 1993 WL 666696, E.D., Arkansas, December, 1993—drafted just before final passage of the NRA—Judge Reasoner concluded that since the ICC has primary jurisdiction over both "the contract carriage and rate reasonableness issues presented in this case, this court finds that this case should be referred to the ICC." The contract and rate reasonableness issues are also present in the case at bar, and contrary to plaintiff's contention, a threshold showing has been made that the ICC could find the ICC rates unreasonable. In *Atlantis Express, Inc. v. Standard Transportation Services,* 955 F.2d 529 (8th Cir.1992), the Eighth Circuit established the legal rule on this issue: "It is well established that the ICC has primary jurisdiction to determine whether filed rates were reasonable. If the conclusory assertion of rate unreasonableness requires referral to the ICC, however, unjustified delays could occur. Accordingly, to justify referral, parties must make a threshold showing that the ICC could find the filed rates unreasonable." Relevant factors in making this determination include whether the filed rate would have moved the traffic, and how the carrier's rates compare with competitively set rates for the same traffic, "especially those rates offered by healthy (non-bankrupt) carriers." *Id.* at 537. In this case, Walter B. Walker, a transportation consultant registered to practice before the ICC, stated in an affidavit:

During the period of July, 1988 through July 1990, AFCO tendered freight to Jones under a Transportation Agreement that became effective on April 20, 1987 and provided for a discount of 35% against published rates on outbound and inbound shipments. Effective July 31, 1990, a discount of 20% was published in tariff JTLS 650, item 6561. This discount was republished at 35% in JTLS 650 Item 6561–A effective March 26, 1991. Though the discount was lowered when first published in tariff form, and later raised, it evidences a continuity of the intent to provide a discount. At the same time, there was a discount of 35% published in Item 757 of Saia Motor Freight Tariff 669–E that became effective on Nov. 17, 1986. This discount covered shipments into the same territory served by Jones. AFCO had every reason to believe that the Agreement was issued under Jones Contract authority and if there was any anticipation of a problem with the Transportation Agreement's validity, AFCO could have used Saia for the shipments in question . . .

Walker concluded that in light of the agreement and the continued publication of discounts after the period of the agreement, as well as the availability of similar discounts with Saia and other carriers, any rate other than the one originally collected would be unreasonable, and to "arbitrarily set aside the agreement and substitute the common carrier rates would seem to be an unreasonable practice." Despite plaintiff's contrary arguments, the Court finds that defendant has made a threshold showing of rate unreasonableness.

■ While the Supreme Court has observed that no rigid formula exists for applying the doctrine of primary jurisdiction, the reasons for the existence of the doctrine are present in the instant case: " . . . the desirable *uniformity,* which would obtain if initially a specialized agency passed on certain types of administrative questions. More recently the *expert and specialized knowledge of the agencies* involved has been particularly

stressed." *U.S. v. Western Pacific R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–65, 1 L.Ed.2d 126 (1956) (emphasis added). The doctrine applies to claims cognizable in court that contain issues within the special competence of an administrative agency, requiring a "referral" to the agency and staying further proceedings to give the parties an opportunity to obtain a ruling from the Commission. *Hillcrest,* supra, at 5; *Reiter v. Cooper,* —— U.S. ——, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). The ICC clearly has primary jurisdiction over two crucial disputes herein: the question of contract carriage and the question of the "reasonableness" of plaintiff's common carrier rates and practices. In the case at bar, the Court finds that the purposes of the doctrine of primary jurisdiction will be well served by referral of these issues to the ICC, for it will promote uniformity in deciding the statutory questions involved in the numerous Jones Truck Lines cases now pending, and the agency's technical expertise will be of great assistance in the resolution of these issues.

Although it is true that courts had split on some of these matters before the passage of the NRA, Judge Reasoner's opinion in late 1993 (which he amended a few weeks later to note that the NRA also indicated that the case should be referred to the ICC) represents the better view taken by most courts, and it was a correct interpretation of the case law. *Hillcrest,* 2–10. This matter should be referred, based on case law as discussed in Judge Reasoner's decision, as well as by interpretation of statutory provisions in the NRA as discussed by Judge Reasoner as well as Judge Hendren. In dealing with the case at bar, the Court agrees with the conclusion that when Congress passed the NRA, it decided the issue in such cases as this one in favor of referral to the ICC. The NRA was intended—among its other objectives—to eliminate whatever ambiguity previously existed concerning *Maislin* and other case law.

Jones Truck Lines cites the opinion of U.S. Bankruptcy Judge Marvin Wooten, Western District of North Carolina, in support of the contention that the NRA is not applicable to a bankrupt motor carrier. *Langdon M. Cooper, Trustee for Bulldog Trucking, Inc. v. E.I. Du Pont De Nemours & Co.,* U.S. Bankruptcy Court, W.D., North Carolina, Charlotte Division, Feb. 18, 1994 (C–B–90–31936). Wooten noted in *Bulldog Trucking* that the Bankruptcy Code "makes wholly inapplicable a law (such as the NRA) that meets these three conditions: (1) the law is an 'applicable law' that (2) 'is conditioned on the insolvency or financial condition of the debtor' and that (3) 'effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property." *Bulldog,* at 26; 11 U.S.C. 363(*l*). Judge Wooten concluded that the NRA is an "applicable law" pursuant to the first condition stated above "because it purports to apply to all motor carriers transporting freight for compensation, *regardless* of whether the carriers are in bankruptcy." *Id.* According to Judge Wooten, the NRA is an "applicable nonbankruptcy law" because it provides explicitly in Section 9 (cited above) that it does not amend Title 11 [the Bankruptcy Code]. Wooten emphasized that 11 U.S.C. 363(*l*) and 541(c)(1) "invalidate an otherwise 'applicable law' [363(*l*)] or 'applicable nonbankruptcy law' [541(c)(1)] that seeks to modify the property rights of a debtor based on its financial condition." *Id.* at 44.

■ For several reasons, the Court believes that Judge Wooten's recommended order and Jones' similar argument in the case at bar are based upon an incorrect analysis of the NRA. First, the NRA does not violate either 11 U.S.C. 363(*l*) or 11 U.S.C. 541(c)(1), for NRA Sections 2(a) and 2(e) [3] are not "conditioned on the insolvency or financial condition" of the carriers making the undercharge claims. (*United States' Suggestion of Interest,* Memorandum by United States Department of Justice, filed in response to the recommended order in *Bulldog Trucking,* March, 1994; this is a recommended order pending before the U.S. District Court, W.D., North Carolina, Charlotte Division, and of course has no binding effect until reviewed

---

**3.** Section 2(a) provides that shippers who challenge the reasonableness of non-operating carriers' rates will not have to pay any undercharges

until the ICC has given a determination as to the reasonableness of the rate; Section 2(e) is the

by the District Court).[4] The Bankruptcy Court incorrectly equated a carrier's financial condition with the NRA's Section 2 provisions dealing with a carrier that "is no longer transporting property, or is transporting property for the purpose of avoiding the application" of the NRA. *Id.* (Jones, of course, is no longer transporting property). In a similar case decided in recent weeks, another judge concluded that "The operation of Section 2(a) turns on whether the carrier is still transporting property, whereas the operation of Section 541(c)(1) depends on the financial status of the debtor. These two criteria are not the same." *Jones Truck Lines v. Aladdin Synergetics, Inc.*, No. 3–93–0442, at 10–11 (M.D.Tenn., Feb. 11, 1994). In the brief period since the NRA became law, one court has already held that Section 2(a) had no effect on the undercharge claims of a bankrupt carrier that was still transporting property under Chapter 11 of the Bankruptcy Code, but would apply to a financially solvent carrier that has ceased operations. *Gross Common Carrier v. A.B. Dick Co.*, 1994 WL 8241 (N.D., Ill., Dec. 21, 1993). There is a meaningful distinction between a debtor's financial condition and its operating status: as counsel for the U.S. Department of Justice and the ICC noted in their memorandum in *Bulldog Trucking*, the forces of the marketplace and the incentive to maintain good business relations will restrain operating carriers from making unfounded or tenuous undercharge claims, but there is no such check on nonoperating carriers. *United States' Suggestion of Interest*, supra, at 18.

■ More importantly, not only do the Bankruptcy Code provisions *not* invalidate the NRA, but based on the voluminous legislative history cited earlier in this order, Congress clearly intended the NRA to apply to bankrupt carriers, Judge Wooten's opinion to the contrary notwithstanding. One of the canons of statutory construction provides that courts will construe a statute's language "so as to give effect to the intent of Congress." *United States v. Underhill*, 813 F.2d 105, 111 (6th Cir.) *cert. denied*, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987). In discerning congressional intent, a court first looks to the statutory language, and if it is unclear it then relies upon the legislative history. *Adams v. Dole*, 927 F.2d 771, 774 (4th Cir.1991). If the "literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters ... the intention of the drafters, rather than the strict language, controls." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). As discussed, supra, the congressional intent can easily be discerned from the myriad passages in the legislative history seconding the House Report's statement that the bill is intended "to provide a statutory process for resolving claims involving negotiated transportation rates brought about by trustees of non-operating motor carriers for past transportation services." *House Report No. 103–359*, Nov. 15, 1993, U.S.Code Cong. & Admin.News 1993, 2534, 2534 (1993 WL 474910.)

■ The interpretation urged upon the Court by Jones would also violate another of the major canons, well stated by the Ninth Circuit in *Matter of Borba*, 736 F.2d 1317, 1320 (9th Cir.1984): "It is the duty of the court to give significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purposes, and to give effect to the statute as a whole, and not render it partially or entirely void." Judge Wooten's interpretation turns upon a small part of the statute and effectively renders it void from the standpoint of the major goal Congress intended it to accomplish. Moreover, when Congress enacts a new statute, courts presume that the legislators considered previous laws and passed the later law in harmony with the policy embodied in the earlier statute, in the absence of any express repudiation or modification. *Hellon & Assoc. Inc. v. Phoenix Resort Corp.*, 958 F.2d 295 (9th Cir.1992); *Marlowe v. Bottarelli*, 938

provision giving the ICC jurisdiction to determine the "unreasonable practice" issue.

4. 28 U.S.C. 517 authorizes the U.S. Attorney General to send "any officer of the Department of Justice ... to attend to the interests of the United States." Under this statute, the United States may assert to a court its position or those of an involved agency in matters of significant interest. The United States pointed out that the Trustee had presented challenges to the NRA that are common to numerous pending proceedings. *Bulldog Trucking,* at 4.

F.2d 807, 813 (7th Cir.1991). *Bulldog Trucking* finds a conflict between the NRA and the Bankruptcy Code, but this Court disagrees. As discussed above, the statute does not apply exclusively to bankrupt carriers, but to many carriers who are in bankruptcy as well as to other non-operating carriers. The *Bulldog* construction of the statute would render it a nullity in many of the cases for which Congress designed it to apply—that is, when a carrier is in bankruptcy. This Court concurs with the District Court's conclusion in *Aladdin,* supra, that Jones Truck Lines' interpretation "is patently at odds with Congress' intent in enacting the NRA ... This court construes the NRA, consistent with Congress' intent, as applying to bankrupt carriers." *Aladdin,* at 10.

Even if the Court were to accept, *arguendo, Bulldog*'s interpretation and decide that the two statutes were irreconcilably in conflict, Judge Wooten's view would still come into conflict with another canon: the statute that is the more recent and specific—in this case the NRA—usually controls the earlier and more general statute. *Hellon,* supra, at 297. However, as discussed above, this Court finds no irreconcilable conflict between the statutes. The expansive interpretations of the Bankruptcy Code and Section 9 of the NRA urged by Jones Truck Lines would invalidate its core provisions against bankrupt carriers, thus violating the fundamental principle of statutory construction that courts should harmonize the provisions of different statutes rather than nullifying one of them.

Had Congress been concerned about a potential clash between provisions of the Bankruptcy Code and the NRA, courts presume that such a vital issue would have been addressed in the hearings, debates, or legislative reports; yet *Bulldog* cited no legislative history in which Congress considered any such purported conflict, and the Court is not aware of any such history. Rather, a more plausible view of the legislative history reveals that Section 9 was included to clarify the jurisdiction of the bankruptcy courts vis-a-vis the jurisdiction of the ICC; as Representative Shuster stated, the obligation of the court to refer certain determinations to the ICC for resolution "is mandatory and not discretionary:"

Section 9 ... clarifies the Committee's intention that [the NRA] does not affect the jurisdiction of the courts of the United States, including bankruptcy courts, to determine any matter regarding a bankrupt carrier, *other than determinations statutorily required by the NRA to be resolved by the ICC.* The obligation of the court or the bankruptcy court to refer any of these determinations to the ICC in accordance with this statute *is mandatory and not discretionary.* The committee intends in Section 9 that the courts in which the bankrupt carrier's estate is being adjudicated should continue to make all other determinations necessary to fully and finally wind up a bankrupt carrier's estate proceedings. 139 Cong.Rec. H9597. (emphasis added)

In interpreting an Act that was intended to end the burdensome, expensive litigation over undercharge claims, it would be absurd to imagine that Congress intended to generate yet a new spiral of litigation by creating a conflict between the Code and the NRA. *U.S. Suggestion of Interest,* supra, at 22.

*Bulldog* errs in contending that Section 9 of the NRA, in providing that the Act does not limit court jurisdiction under Title 28, overrides Section 8 of the Act and preserves for bankruptcy courts the authority to determine a shipper's contract carriage defenses. This view is incorrect because Section 9 makes clear that the NRA does not divest the courts of their original jurisdiction over the undercharge claims of defunct carriers. Rather, Section 8 codifies the ICC's primary jurisdiction to decide the defense often raised by shippers that the disputed transportation was moved by contract carriage, and thus not subject to filed rates. *United States' Suggestion of Interest,* Memorandum by U.S. Department of Justice, in *Langdon M. Cooper, Trustee for Bulldog Trucking, Inc., v. Agrolinz,* (U.S. Bankruptcy Court, W.D. North Carolina, Charlotte Division, March, 1994). Section 8's requirement that the ICC must rule on a shipper's contract/common carriage defense does not remove the court's original jurisdiction—which Section 9 preserves—to hand down a final ruling on the undercharge claims, because the ICC's determination is still subject to deferential review by the

court to determine whether or not to enforce the ruling. 28 U.S.C. 1336(b).

The Court notes that U.S. District Courts in Arkansas, Tennessee and Florida have reached similar conclusions regarding these issues and ruled in favor of referral to the ICC. *See e.g., Jones Truck Lines, Debtor-in-Possession v. ASCO Hardware*, LR–C–93–459 (E.D.Arkansas, March, 1994.) In one of the largest motor carrier bankruptcies pending in the country, P.I.E. Nationwide recently acknowledged that Section 8 "mandates" referral of contract/common carriage disputes and withdrew its earlier opposition to such referrals. *Whitaker v. Capitol Core*, No. 91–1074–Civ–J–16, No. 93–2–MV–J–16, 1994 WL 243463 (M.D.Fla., Feb. 28, 1994). The District Court agreed with P.I.E.'s conclusion, holding that it "had no recourse but to refer this cause to the ICC for a determination as to the nature of the parties' dealings." *Id.* Similarly, Judge Higgins for the U.S. District Court, Middle District of Tennessee, recently described Jones' Truck Lines' argument that the NRA does not apply to bankrupt carriers as "a last-ditch attempt to avoid the effects of the NRA." *Aladdin,* supra, at 9. The Court agrees with Judge Higgins' conclusion. The Court knows of no other Court that has agreed with *Bulldog*'s conclusions in the post-NRA era of this litigation crisis. Consistent referral of these proceedings and similar cases will promote uniform, national resolution of the vast inventory of undercharge claims.

The Court grants defendant's motions for a stay and referral to the ICC of the questions stated in defendant's motion. The Clerk is instructed to administratively terminate this case. The court orders this case dismissed without prejudice with leave to reinstate within 30 days of the ruling by the ICC if any further proceedings are necessary herein. If no such motion is filed, this case will be dismissed with prejudice.

It is so ordered.