**In re TRANSCON LINES, Debtor.**

**Leonard L. GUMPORT, Trustee of the Bankruptcy Estate of Transcon Lines, Plaintiff–Appellant,**

v.

**STERLING PRESS, Defendant–Appellee.**

No. 94–55425.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 6, 1994.

Decided July 10, 1995.

As Amended on Denial of Rehearing and Rejection of Suggestion for Rehearing En Banc Sept. 14, 1995.

Leonard L. Gumport, Hufstedler & Kaus, Patrick L. Shreve, Tuttle & Taylor, Los Angeles, CA, for plaintiff-appellant.

Daniel J. Sweeney, McCarthy, Sweeney & Harkaway, Washington, DC; Richard H. Streeter, Barnes & Thornburg, Washington, DC, for defendant-appellee and amici curiae National Small Shipments Traffic Conference, Inc. and Health and Personal Care Distribution Conference, Inc.

Beth E. Cook, U.S. Dept. of Justice, Washington, DC, for amicus curiae U.S.

Frederic L. Wood, Donelan, Cleary, Wood & Maser, Washington, DC, for amici curiae The National Industrial Transportation League and The Transp. Claims and Prevention Council.

Robert W. Baker, Halfpenny, Hahn, Roche & Marchese, Chicago, IL, for amicus curiae National Ass'n of Wholesaler–Distributors.

Before: WALLACE, Chief Judge, REINHARDT and BRUNETTI, Circuit Judges.

WALLACE, Chief Judge:

Gumport, in his capacity as trustee of the bankruptcy estate of Transcon Lines (Transcon), appeals from the district court's summary judgment in favor of Sterling Press (Sterling). The determinative issue in this case is whether certain antiforfeiture provisions of the Bankruptcy Code, 11 U.S.C. §§ 363(*l*) and 541(c)(1)(B), prohibit the application of section 2 of the Negotiated Rates Act of 1993 (Rates Act), Pub.L. No. 103–180, 107 Stat. 2044 (partially codified at 49 U.S.C. § 10701(f)), to a nonoperating motor carrier of freight in bankruptcy. The district court answered this question in the negative. It had jurisdiction pursuant to 28 U.S.C. § 1334. We have jurisdiction over this timely appeal under 28 U.S.C. § 1291. We affirm.

I

The operative facts of this case are not in dispute. Transcon was a motor common carrier of freight that provided transportation for compensation in interstate commerce. Transcon became a Chapter 7 debtor in bankruptcy in 1990 and is no longer transporting property. Sterling is a former customer of Transcon that shipped freight with Transcon in interstate commerce from May 21, 1987, to May 1, 1990, prior to Transcon's bankruptcy filing. Gumport sued to collect $28,269.61 for transportation provided by Transcon for Sterling, an amount in addition to the charges originally billed to Sterling and collected by Transcon. This sum represents the difference between the amount actually charged by Transcon and the amount due under the tariff filed by Transcon with the Interstate Commerce Commission (Commission).

The parties stipulated that Sterling qualifies as a "small-business concern" as defined by the Small Business Act, 15 U.S.C. § 632. They further stipulated that the rate offered to Sterling by Transcon was a "negotiated rate" as that term is defined in section 2(e)(6)(B) of the Rates Act.

II

At the time Transcon shipped property for Sterling, the Interstate Commerce Act (Commerce Act) prohibited motor common carriers of freight (i.e., trucking companies) from charging more or less than the rates contained in tariffs properly filed with the Commission. 49 U.S.C. §§ 10761(a), 10762(a). Although the Trucking Industry Regulatory Reform Act of 1994 (Reform Act), Pub.L. No. 103–311, §§ 201–212, 108 Stat. 1683, appears to amend the Commerce Act to repeal prospectively the "filed rate doctrine" altogether and make it impossible for motor carriers of property to collect undercharge claims regardless of whether they are still transporting property, the undercharge claims at issue here are not affected by the Reform Act. Section 206(e)(j) of the Reform Act specifically provides that "[n]othing in this section shall affect the application of the provisions of the [Rates Act] ... to undercharge claims for transportation provided prior to the date of enactment of [the Reform Act]." This language is clear and unambiguous. The Commission apparently agrees. *See Twin Modal, Inc.—Petition For Declaratory Order—Agreements For Contract Carriage,* No. MC–C–30178 (Sept. 12, 1994) at n. 2. Because the undercharge claims at issue here all relate to transportation provided before its enactment on August 26, 1994, the Reform Act does not apply. We express no opinion concerning the effect of the Reform Act on undercharge claims that relate to transportation provided after its enactment.

Sterling and amici explain that motor common carriers frequently negotiate discounted rates with shippers that differ from the rates contained in tariffs filed by the carrier with the Commission. When carriers become bankrupt or otherwise cease their operations, they lose the incentive to maintain goodwill with shippers, and may sue to collect "undercharges"—the difference between the tariff rate and the amount actually charged—under the "filed rate doctrine." Although the Commission sought to alleviate this problem by declaring the practice of attempting to collect the filed rate after negotiating a lower rate an unreasonable practice, the Supreme Court invalidated the Commission's negotiated rates policy as inconsistent with the Commerce Act. *Maislin Indus. U.S. v. Primary Steel,* 497 U.S. 116, 130, 110 S.Ct. 2759, 2768,

111 L.Ed.2d 94 (1990). The Court explained that, "[i]f strict adherence to §§ 10761 and 10762 [of the Commerce Act] as embodied in the filed rate doctrine has become an anachronism in the wake of the [Motor Carrier Act of 1980 (which deregulated the industry)] it is the responsibility of Congress to modify or eliminate these sections." *Id.* at 136, 110 S.Ct. at 2771. Congress eventually responded by passing the Rates Act.

Section 2 of the Rates Act provides shippers with certain defenses to undercharge claims. Under section 2(a)(2), claims involving shipments weighing 10,000 pounds or less can be satisfied by payment of 20% of the undercharge. 49 U.S.C. § 10701(f)(2). Under section 2(a)(3), claims involving shipments weighing more than 10,000 pounds can be satisfied by payment of 15% of the undercharge. 49 U.S.C. § 10701(f)(3). Under section 2(a)(4), claims involving public warehousemen can be satisfied by payment of 5% of the undercharge. Finally, under section 2(a)(9), "small-business concerns" (such as Sterling) and certain other entities are completely relieved of any and all liability for undercharges. 49 U.S.C. § 10701(f)(9). Moreover, section 2(e) makes it an "unreasonable practice" for a carrier to attempt to collect more than the negotiated rate for transportation provided prior to September 30, 1990. This applies to all of Sterling's shipments.

Sections 2(a)(2), (3), (4), and 2(e) expressly apply, however, only to claims made by a carrier that "is no longer transporting property" or is transporting property "for the purpose of avoiding the application of [sections 2(a) or 2(e)]." 49 U.S.C. § 10701(f)(1)(A) (Rates Act § 2(a)(1)); Rates Act § 2(e)(1) (same).

In considering these section 2 provisions, however, some courts have concluded that section 2(a)(9), 49 U.S.C. § 10701(f)(9), completely frees small-business concerns and certain other entities of any and all liability for undercharge claims, regardless of whether the carrier is no longer transporting property. *See Jones Truck Lines v. Whittier Wood Prods. Co. (In re Jones Truck Lines),* 57 F.3d 642, 647 (8th Cir.1995) (*Whittier*); *North Penn Transfer v. Polykote Corp.,* 170 B.R. 565, 567 (Bankr.E.D.Pa.1994) (*Polykote*); *Hoarty v. Midwest Carriers Corp. (In re Best Refrigerated Express),* 168 B.R. 978, 984–85 (Bankr.D.Nebr.1994). These courts have reasoned that since section 2(a)(1), 49 U.S.C. § 10701(f)(1), which contains the requirement that the carrier no longer be transporting property, refers only to subsections (2), (3), and (4), and not to section 2(a)(9), section 2(a)(9) must apply regardless of whether the carrier is no longer transporting property. Although one might think that the omission of any reference to section 2(a)(9) in section 2(a)(1) was but an unintended error in drafting the legislation, the court in *Hoarty* correctly pointed out that section 2(a)(7) contains a reference to section 2(a)(9) as well as to sections 2(a)(2), (3), and (4). The obvious implication is that if Congress was alert enough to include a reference to section 2(a)(9) in section 2(a)(7), it was also alert enough to include such a reference in section 2(a)(1) if it intended small businesses and other entities protected by section 2(a)(9) to be required to make the showing demanded by section 2(a)(1).

Although we appreciate the analysis of this issue in *Whittier, Hoarty,* and *Polykote,* the question has not been addressed extensively in the briefs filed in this appeal. Indeed, Sterling has not addressed the argument at all. We need not reach this issue, however, if we conclude that conditioning the application of section 2 on a motor carrier's nonoperational status is not, in the unique context of the motor freight industry, equivalent to conditioning it on the insolvency or financial condition of the debtor. Thus, we would not need to decide whether section 2(a)(9) applies only to motor carriers that are no longer transporting property. In either case, the Bankruptcy Code's antiforfeiture provisions would not preclude its application. We now turn to that question.

## III

Sterling invoked both section 2(a) (restrictions on collections) and section 2(e) (time limits) in defense against Transcon's undercharge claim. Transcon countered, however, that sections 2(a) and 2(e) do not apply to Transcon due to the protections afforded it

under the antiforfeiture provisions of the Bankruptcy Code, 11 U.S.C. §§ 363(*l*) and 541(c)(1)(B).

Section 363(*l*) provides:

> [T]he trustee may use, sell, or lease property under subsection (b) or (c) of this section, or a plan under chapter 11, 12, or 13 of this title may provide for the use, sale, or lease of property, *notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor,* on the commencement of a case under this title concerning the debtor, or on the appointment of or the taking possession by a trustee in a case under this title or a custodian, and that *effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.*

11 U.S.C. § 363(*l*) (emphasis added). Similarly, section 541(c)(1) states:

> [A]n interest of the debtor in property becomes property of the estate ... *notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law ... that is conditioned on the insolvency or financial condition of the debtor,* on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that *effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.*

11 U.S.C. § 541(c)(1) (emphasis added).

Transcon contends that the undercharge claims are property for purposes of the Bankruptcy Code and that, under the antiforfeiture provisions quoted above, sections 2(a) and 2(e) of the Rates Act cannot be applied to Transcon. The district court granted summary judgment for Sterling after concluding that section 2 of the Rates Act applies to Transcon's claims notwithstanding the relevant provisions of the Bankruptcy Code.

## IV

 The district court's summary judgment is reviewed de novo. *Jesinger v. Nevada Federal Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994). When reviewing a district court's summary judgment, we must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* Because the facts of this case are not in dispute, our inquiry is limited to a de novo review of the district court's legal conclusion.

Three arguments have been advanced in support of Sterling's contention that section 2 applies to Transcon's undercharge claim irrespective of the Bankruptcy Code's antiforfeiture provisions. First, it has been suggested that even if section 2 does come within the scope of the Bankruptcy Code's antiforfeiture provisions, it would merely constitute a pro tanto amendment of the Bankruptcy Code. Second, Sterling argues that even if section 2 is conditioned on the "insolvency or financial condition" of the carrier, it is nonetheless outside the scope of the antiforfeiture provisions because section 2 does not prevent property from coming into the hands of the bankruptcy estate but merely defines the scope of the property right in the first place. Finally, it is argued that conditioning section 2 on the operational status of the carrier is not the same as conditioning it on the carrier's financial condition. We address each of these contentions.

### A.

 We first address the contention that the Rates Act could amend the Bankruptcy Code. Section 9 of the Rates Act, which is captioned "Limitation on Statutory Construction," provides that, "[n]othing in this Act ... shall be construed as limiting or otherwise affecting the application of title 11, United States Code, relating to bankruptcy; title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974."

Although the parties argue extensively over the proper interpretation of the relevant legislative history, we refuse to look further than the face of the statute. By its express terms, section 9 states that the Rates Act "shall not be construed as limiting or otherwise affecting" the application of the Bankruptcy Code. Because this language unambiguously precludes us from interpreting the Rates Act as amending the Bankruptcy Code and does not produce a patently absurd result, we cannot resort to an examination of the relevant legislative history. *Nugget Hydroelectric v. Pacific Gas & Elec. Co.*, 981 F.2d 429, 433 (9th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 2336, 124 L.Ed.2d 247 (1993).

It has been argued both that the meaning of section 9 is not clear and unambiguous and that to give section 9 its plain meaning would produce a patently absurd result in that it would frustrate the application of the principal operative provisions of the Rates Act. Our response is based, in part, upon *Nugget Hydroelectric,* where we were faced with a remarkably similar problem of statutory construction. We were forced to decide whether the Public Utility Regulatory Policies Act of 1978 (Policies Act) preempted the state action doctrine with respect to gas and electric utilities. *Id.* One provision of the Policies Act provided that "[n]othing in this Act or in any amendment made by this Act affects ... the applicability of the antitrust laws to any electric utility or gas utility." *Id., quoting* 16 U.S.C. § 2603(1). Nugget argued that the term "antitrust laws" referred only to statutory law and not to the common law state action doctrine. It also argued that the statute was ambiguous and that the legislative history revealed that Congress clearly intended the Policies Act to preempt the state action doctrine. *Id.* We held that the language of the statute was clear, that it precluded us from holding that the Policies Act preempted the state action doctrine, and that it did not produce an absurd result. *See id.* Therefore, we refused to look any further than the face of the statute.

■■■ The approach taken in *Nugget Hydroelectric* is the correct one to take in this case as well. As the Supreme Court has

explained: "[I]n interpreting a statute a court should always turn to one cardinal canon before all others.... [C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). Indeed, "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Id.* (citations omitted).

Some of the bankruptcy courts that have addressed this issue have refused to give section 9 its plain meaning on the ground that the legislative history shows that the fundamental objective or "plain purpose" of the statute was to eliminate the problem of undercharge claims filed by bankrupt carriers. These courts have reasoned that if section 9 were given its obvious meaning, they would be forced "to sanction the absurd position that Congress only intended the statute to apply to carriers that are 'no longer transporting property,' but that have not filed for bankruptcy." *Jones Truck Lines v. Grinnell Corp.,* 167 B.R. 488, 493 (N.D.Ill.1994) (*Grinnell* ).

■■■ Although it may be clear that the fundamental problem section 2 was designed to remedy was the filing of undercharge claims by bankrupt motor carriers, it is inappropriate for a court to invoke the "broad purpose" of a statute to invalidate specific provisions. As the Supreme Court has explained:

Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the legislative problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise

and, in the end, prevents the effectuation of congressional intent.

*Board of Governors of the Federal Reserve System v. Dimension Financial Corp.,* 474 U.S. 361, 373–74, 106 S.Ct. 681, 688–89, 88 L.Ed.2d 691 (1986).

■ Section 9 contains broad language which prohibits any construction of the Rates Act which would have the effect of "limiting" or "affecting" the application of the Bankruptcy Code. The meaning of this section is clear. It is to prevent courts from construing the Rates Act as a pro tanto amendment of the Bankruptcy Code. As one court has explained: "Section 9 of the [Rates Act] merely provides that if a conflict exists between the [Rates Act] and the Bankruptcy Code, then the Code takes precedence." *De'Medici v. FDSI Mgmt. Group (In re Lifschultz Fast Freight Corp.),* 174 B.R. 271, 278 (N.D.Ill.1994).

### B.

■ We now address the argument that section 2 of the Rates Act is outside the scope of the antiforfeiture provisions of the Bankruptcy Code even if it is "conditioned on the insolvency or financial condition of the debtor" because it does not prevent property from coming into the bankruptcy estate.

In support of this argument, Sterling relies on our opinion in *In re Farmers Markets, Inc.,* 792 F.2d 1400, 1402 (9th Cir.1986). *Farmers Markets,* however, is easily distinguishable. There, California Business and Professions Code § 24049 prohibited *all* holders of liquor licenses from transferring their licenses until certain state taxes had been paid. *See id.* at 1401. Several liquor license holders in bankruptcy attempted to sell their licenses without paying the relevant taxes. *Id.* We held that section 541(c)(1) of the Bankruptcy Code did not preclude the enforcement of section 24049 against a debtor in bankruptcy, and that a bankrupt holder of such a license, just like any other holder of the same type license, could not sell it without paying the relevant tax. *Id.* at 1402–04. We reasoned that since the property rights of a holder of a liquor license were limited by section 24049 before the filing of a bankruptcy petition, section 24049 did not operate to

prevent property from coming into the hands of the bankruptcy estate. *Id.* at 1402–03.

■ In *Farmers Markets,* section 24049 applied to *all* holders of liquor licenses. Here, the situation is different. Sections 2(a) and 2(e) of the Rates Act do not apply to all motor carriers of freight. If they did, sections 2(a) and 2(e) would simply modify the property rights of all holders of undercharge claims and the Bankruptcy Code would clearly be irrelevant. However, because these sections apply only to carriers of freight that are no longer transporting property, they arguably effect a forfeiture of property that is conditioned on the debtor's financial condition.

It is true that nonbankruptcy law defines the nature, scope, and extent of the property rights that come into the hands of the bankruptcy estate. *Id.* at 1402. But that is because nonbankruptcy law defines the nature of property rights in the absence of bankruptcy, and only those property rights which are owned by the debtor become the bankruptcy estate. Thus, *Farmers Markets* stands for the proposition that section 541(c)(1) does not increase a debtor's property rights, but merely preserves them.

While Sterling correctly points out that section 541(c)(1)(B) acts to ensure that all property of the debtor becomes property of the bankruptcy estate upon the filing of the bankruptcy case, Sterling fails to mention that section 363(*l*) protects the "use" of such property once it is in the hands of the bankruptcy estate.

Transcon's undercharge claims are "property" for purposes of the Bankruptcy Code. *Sierra Switchboard Co. v. Westinghouse Electric Corp.,* 789 F.2d 705, 707 (9th Cir. 1986) (causes of action are "property" protected by section 541). It is also clear that federal statutes, like the Rates Act, constitute "applicable nonbankruptcy law" within the meaning of section 541(c)(1) and "applicable law" within the meaning of section 363(*l*). *Patterson v. Shumate,* 504 U.S. 753, 757, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992) (ERISA constitutes "applicable nonbankruptcy law"). Moreover, it is obvious that section 2 of the Rates Act, by limiting the right of

carriers to collect undercharge claims to 0% to 20% of the original claim, "effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property."

### C.

■ Finally, we determine whether section 2 of the Rates Act is "conditioned on the insolvency or financial condition of the debtor." If so, section 363(*l*) of the Bankruptcy Code will prohibit its application to bankrupt carriers and Transcon will prevail on its undercharge claim. If not, section 2 will apply to Transcon and will shield Sterling from liability for the claim.

As stated earlier, sections 2(a)(2), (3), (4), and 2(e) of the Rates Act expressly apply only to a carrier that "is no longer transporting property" or is transporting property "for the purpose of avoiding the application of this subsection." 49 U.S.C. § 10701(f)(1)(A) (Rates Act § 2(a)); Rates Act § 2(e)(1) (same). For purposes of this analysis we assume, without deciding, that section 2(a)(9) is also subject to this same condition. Transcon argues that by conditioning the forfeiture or modification of property on the status of no longer transporting property, the Rates Act effectively conditions such forfeiture or modification on the "financial condition" of the debtor.

In support of this assertion, Transcon has presented the declaration of Mr. Chelliah, an accountant who states that "when used to describe a motor carrier of property, the words 'no longer transporting property' refer to and describe the financial condition of the motor carrier." Mr. Chelliah further states that such a carrier would be required, under generally accepted accounting principles, to report its nonoperational status on its balance sheets. Presented along with Mr. Chelliah's declaration are certain accounting texts that emphasize the importance of operating income as an element of financial reporting and as an indicator of the overall financial condition of an enterprise.

Sterling and amici argue, however, that the nonoperational condition of the debtor is not necessarily the same as the insolvency or financial condition of the debtor. They correctly observe that it is possible for a carrier to stop transporting freight and yet remain solvent. They also correctly point out that it is possible for a carrier to seek bankruptcy protection and still continue to transport property under a plan of reorganization. Indeed, a number of bankruptcy courts have found determinative that insolvency and nonoperational status are not concentric. *See, e.g., Grinnell,* 167 B.R. at 493; *Allen v. ITM, Ltd.,* 167 B.R. 63, 66 (M.D.N.C.1994).

Sterling and amici also maintain that there is a valid reason to differentiate based on operational status other than simply to evade the antiforfeiture provisions of the Bankruptcy Code. A carrier that is actively engaged in the business of transporting property has a strong disincentive to file unreasonable undercharge claims: the need to maintain goodwill with its customers. On the other hand, a nonoperational carrier, regardless of its financial condition, has no disincentive to file such claims. This rationale has been relied on by several other courts in holding that conditioning the application of section 2 on the nonoperational status of a motor carrier of freight is not equivalent to conditioning it on their insolvency or financial condition. *See, e.g., Whittier,* 57 F.3d at 647; *Jones Truck Lines v. AFCO Steel,* 849 F.Supp. 1296, 1304–05 (E.D.Ark.1994); *Polykote,* 170 B.R. at 568.

Sterling and amici point to the example of A–Line, Ltd., a large motor carrier that divested its operations yet continued to procure a healthy stream of income by collecting on the numerous undercharge claims it possessed. Moreover, Gumport himself emphasized at oral argument that there are a substantial number of large nonoperating motor carriers that are not in bankruptcy.

Both in its briefs and at oral argument, Transcon has persuasively emphasized that a motor carrier's nonoperational status "relates to" and is "indicative of" its financial condition. A motor carrier's cessation of operations necessarily has an effect on its financial condition and would certainly be reflected on its financial statements. Thus, the financial condition of a motor carrier and its operational status are indeed related. However,

because of the unusual characteristics of the motor freight industry, at least as it existed before the enactment of the Reform Act, section 2 is not *"conditioned on"* the insolvency or financial condition of the debtor. *Accord Whittier,* 57 F.3d at 647.

Transcon argues that creating a distinction between financial condition and operational condition will eviscerate the Bankruptcy Code's antiforfeiture provisions and compel courts to enforce default clauses in leases or contracts that are triggered by reference to a party's operational status. In effect, Transcon argues that our decision will make it possible for creditors to evade the Bankruptcy Code's antiforfeiture provisions by conditioning contractual defaults on operational criteria which are actually indicia of a debtor's insolvency or financial condition.

In *In re Tom Stimus Chrysler–Plymouth,* 134 B.R. 676 (Bankr.M.D.Fla.1991), the bankruptcy court held that a similar antiforfeiture provision, 11 U.S.C. § 365, invalidated a provision in a franchise agreement that purported to forfeit the debtor's franchise if the debtor ceased operating for more than 10 days. At least one bankruptcy court has refrained from holding that section 2 of the Rates Act is not conditioned on insolvency or financial condition for fear that it would create conflict with cases such as *Stimus Chrysler–Plymouth* and would preclude the future invalidation of similar default clauses. *See Jones Truck Lines v. IXL Mfg. Co. (In re Jones Truck Lines),* 172 B.R. 602, 613 (Bankr.W.D.Ark.1994). Similarly, another bankruptcy court has shared Transcon's concern that "every creditor and governmental entity would seek to enforce *ipso facto* forfeitures against debtors in bankruptcy on the ground that they no longer have revenues and/or income and/or business operations." *Cooper v. E.I. Du Pont de Nemours & Co. (In re Bulldog Trucking),* 173 B.R. 517, 537 (W.D.N.C.1994) (emphasis in original). We are not swayed by these concerns, however, because we do not hold that conditioning a default on a debtor's operational status is never prohibited by the Bankruptcy Code's antiforfeiture provisions.

The term "financial condition" represents a concept that is somewhat broader than operational status. In some cases, especially when a business has no potential source of significant revenues other than from its operations, a business's operational condition and financial condition might be considered one and the same. However, because of the unusual nature of the motor freight industry that existed before the enactment of the Reform Act, a motor common carrier's solvency or financial condition was not necessarily dependent upon the continuation of operations. There are many former motor common carriers of freight, most notably A–Line, Ltd., that have remained solvent and financially healthy not by continuing their operations, but by turning to the lucrative business of suing their former customers.

Finally, in reaching the conclusion that section 2 is not conditioned on the insolvency or financial condition of the debtor, and therefore does not create a conflict with the Bankruptcy Code's antiforfeiture provisions, we are mindful of the fact that we must, whenever possible, attempt to reconcile potential conflicts in statutory provisions. We have repeated time and time again that "Congress must be presumed to have known of its former legislation ... and to have passed ... new laws in view of the provisions of the legislation already enacted." *Hellon & Assoc. v. Phoenix Resort Corp.,* 958 F.2d 295, 297 (9th Cir.1992) (internal quotations and citations omitted). Thus, our holding is fully consistent with our canons of statutory construction and most likely to effectuate congressional intent.

## V

We conclude that section 2 of the Rates Act is not "conditioned on the insolvency or financial condition of the debtor," and that it therefore does not conflict with the antiforfeiture provisions of the Bankruptcy Code. We hold that section 2 applies to Transcon's undercharge claim against Sterling despite Transcon being in bankruptcy.

We express no opinion on the question of whether section 2(a)(9) applies only to carriers that are no longer transporting property. We also express no opinion on the effect of

the Reform Act on undercharge claims that have arisen after the date of its enactment.

AFFIRMED.