GROSS COMMON CARRIER,
INC., Plaintiff,

v.

A.B. DICK COMPANY, Defendant.

No. 93 C 5012.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 21, 1993.

Robert J. Weber, Robert J. Weber, Ltd., Chicago, IL, John W. Bryant, Eames, Wilcox, Mastej, Bryant, Swift and Riddell, Detroit, MI, for plaintiff.

Steven Jay Seidman, Law Offices of Steven J. Seidman, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

Gross Common Carrier, Inc. ("Gross") sues A.B. Dick Co. ("A.B. Dick") for recovery of alleged freight undercharges for certain shipments. A.B. Dick moves to stay these proceedings and transfer the cause to the Interstate Commerce Commission ("ICC") for a determination of the reasonableness of the tariff rates on file with the ICC ("the filed rates").

### BACKGROUND

Gross is a common carrier under 49 U.S.C. § 10101 *et seq.* (1993). Complaint ¶ 2. Gross transported goods for A.B. Dick across state lines during the years 1988 through 1990. *Id.* ¶ 7 & Exh. A. Gross filed a Chapter 11 bankruptcy petition on August 20, 1991, *id.* ¶ 1, but has continued to operate during the pendency of its bankruptcy proceedings and plans to file its plan for reorganization and emergence from Chapter 11 with the bankruptcy court shortly. Resp., Exh. 2, John W. Bryant Aff. ¶ 6. Gross and A.B. Dick negotiated a tariff rate below the filed rate, and A.B. Dick paid this lower rate. *Id.* ¶ 9. Gross seeks to recover the difference between what A.B. Dick was actually charged and the rate allowed by the filed rates, a total of $12,205.30 plus interest. *Id.* ¶¶ 10, 13 & Exh. A.

In its answer, A.B. Dick raised the affirmative defense that the filed-rate tariffs sought to be enforced are unreasonable and in contravention of ICC rules. Answer ¶ 18. In addition, A.B. Dick counterclaims against Gross that Gross' attempt to collect the difference between the filed rate and the actual rate charged would result in the collection of unjust and unreasonable rates in violation of the Interstate Commerce Act. Answer ¶ 21. A.B. Dick moves to stay these proceedings and to transfer the cause to the ICC for a determination of the reasonableness of the filed rates.

### DISCUSSION

Recent cases in the Supreme Court and this jurisdiction make clear that the reasonableness of a filed rate is within the primary jurisdiction of the ICC and therefore should be resolved by the ICC. *See, e.g., Reiter v. Cooper,* — U.S. —, — — —, 113 S.Ct. 1213, 1220–21, 122 L.Ed.2d 604 (1993); *Maislin Indus., U.S., Inc. v. Primary Steel,* 497 U.S. 116, 129, 110 S.Ct. 2759, 2767, 111 L.Ed.2d 94 (1990); *Jones Truck Lines, Inc. v. Jiffy Products of America, Inc.,* 834 F.Supp. 278, 280 (N.D.Ill.1993); *LaSalle Nat'l Bank v. Badger Paper Mills, Inc.,* 1993 WL 177022, at *2 (N.D.Ill. May 21, 1993); *Lifschultz Fast Freight v. JBS Warehousing, Inc.,* 809 F.Supp. 51, 53 (N.D.Ill. 1992). A.B. Dick need only make a threshold showing to support its claim that the rate is unreasonable. *LaSalle Nat'l Bank,* 1993 WL 177022, at *2 (citations omitted). The parties disagree about whether A.B. Dick has made a threshold showing entitling it to have these proceedings stayed.

A.B. Dick relies on established precedent to argue that the threshold showing may be based on rate comparisons like those A.B. Dick submits. *LaSalle Nat'l Bank,* 1993 WL 177022, at *2; *Jones Truck Lines,* 834 F.Supp. at 281. A.B. Dick presents evidence that, at the relevant times, other common carriers offered rates similar to the rate originally charged. Mot., Exh. 1, David Hoerchler Aff. ¶ 3. Thus, according to A.B. Dick's understanding of the threshold unreasonableness standard, this court must stay these proceedings in order to provide a reasonable opportunity within which A.B. Dick may apply to the ICC for a ruling as to the reasonableness of Gross' filed rates.[1]

---

1. As the Supreme Court noted in *Reiter,* this court has no mechanism to refer the determina-

In the brief time between the filing of A.B. Dick's motion (November 19, 1993) and Gross' response (December 7, 1993), the President signed the Negotiated Rates Act of 1993 ("the Rates Act") into law (December 3, 1993). Negotiated Rates Act, Pub.L. No. 103–180, 107 Stat. 2044 (1993). Gross contends that § 2(g) of the Rates Act changes the showing A.B. Dick must make and that A.B. Dick fails to make this new showing. Since § 2(c) of the Rates Act makes the Rates Act applicable to all claims pending on the date of its enactment, this court must decide whether the Rates Act changes the showing of unreasonableness A.B. Dick must make.

■ The Rates Act is intended to alleviate the explosion of freight motor carrier undercharge litigation. In their reports on the Rates Act bills, both the Senate Committee on Commerce, Science, and Transportation and the House of Representatives Committee on Public Works and Transportation explain the context for the Rates Act. *See* S.Rep. No. 79, 103d Cong., 1st Sess., 1993 WL 241281 (1993); H.Rep. No. 103–359, 103d Cong., 1st Sess., 1993 WL 474910 (1993) ("the House Report"); U.S.Code Cong. & Admin.News 1993, 2534. Motor common carriers are required to file tariffs with the ICC setting forth their rates for transportation services as part of a public record and to collect only those rates. However, carriers and shippers often negotiate lower individual rates for particular transportation services. In many cases, the carriers fail to properly file the negotiated rate with the ICC.

Many carriers have gone bankrupt. In seeking to maximize the assets for creditors, the bankruptcy receiver or trustee frequently retains an auditor to search the records of the carrier for instances in which the rates billed and collected were lower than the applicable rates on file at the ICC. When these discrepancies are discovered, the receiver or trustee then files a collection action to recover the difference from the shipper. The shipper usually refuses to pay the claim,

on the grounds that the shipper and the carrier had a valid agreement for a lower rate, and any obligation to file the tariff was the carrier's; therefore, the shipper may not now be penalized for the carrier's failure to file.

In its early decisions, the ICC agreed with the shippers, finding that such collection practices were unreasonable and that only the negotiated rate should be allowed to be collected. This position was upheld by five of the six circuit courts that considered the issue. The Supreme Court disagreed, concluding in *Maislin Indus., U.S. v. Primary Steel*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), that the ICC had no authority to find undercharge suits as an "unreasonable practice" and that departures from the filed tariff schedule are contrary to the language and structure of the Motor Carrier Act. *Maislin*, 497 U.S. at 130, 110 S.Ct. at 2768. However, *Maislin* did not rule out the defense that a shipper could argue that the filed rates themselves were unreasonable. *Id.* at 128–29, 110 S.Ct. at 2767.

■ The Rates Act was enacted against this backdrop. The Rates Act amends 49 U.S.C. § 10701 by adding a new section (f) entitled "Procedures for Resolving Claims Involving Unfiled, Negotiated Rates." Rates Act, § 2(a). New § (f)(6) delays payment of any claim *until the ICC has determined the reasonableness of the challenged rate. Id.* (Emphasis added). Thus the Rates Act appears to strengthen A.B. Dick's contention that these proceedings must be stayed until the ICC determines the reasonableness of Gross' filed rates.

Gross argues that the Rates Act actually undermines A.B. Dick's contention because Gross, although it is in bankruptcy, is still operating. New § 10701(f)(1)(A) makes clear that the Rates Act applies to carriers that are no longer transporting property or are merely transporting property for the purpose of avoiding the application of the Rates Act. Rates Act, § 2(a). Since Gross

---

tion of the reasonableness of Gross' filed rates to the ICC. *Reiter v. Cooper*, —— U.S. ——, ——, n. 3, 113 S.Ct. 1213, 1220 n. 3, 122 L.Ed.2d 604 (1993). The proper procedure is to allow A.B.

Dick a reasonable time in which to apply to the ICC for a ruling. *Id.* A.B. Dick may file an administrative complaint pursuant to 49 U.S.C. §§ 11701(b), 11705(c)(1) (1993).

is still operating, and has operated during the pendency of its Chapter 11 petition, Gross argues that the procedures established in new § 10701(f) simply do not apply.

■ Gross argues that the Rates Act instead changes A.B. Dick's burden of making a threshold showing of unreasonableness. Gross contends that § 2(g) of the Rates Act imposes a cost analysis standard under which A.B. Dick must show that the filed rate exceeds the amount necessary to cover total operating expenses plus reasonable profits in amounts adequate to provide sound motor carrier transportation. Resp. at 3, citing 49 U.S.C. § 10701(e), as amended. Old § 10701(e) explains the standard for determining the reasonableness of rate levels of motor carriers:

> In proceedings to determine the reasonableness of rate levels for a motor carrier or group of motor carriers, ... the [ICC] shall authorize revenue levels that are adequate under honest, economical, and efficient management to cover total operating expenses, including the operation of leased equipment and depreciation, plus a reasonable profit. The standards and procedures adopted by the [ICC] under this subsection shall allow the carriers to achieve revenue levels that will provide a flow of net income, plus depreciation, adequate to support prudent capital outlays, assure the repayment of a reasonable level of debt, permit the raising of needed equity capital, attract and retain capital in amounts adequate to provide a sound motor carrier transportation system in the United States, and take into account reasonable estimated or foreseeable future costs.

Section 2(g) of the Rates Act amends § 10701(e) by adding the following at the end:

> Any complaint brought against a motor carrier (other than a carrier described in subsection (f)(1)(A)) by a person (other than a motor carrier) for unreasonably high rates for past or future transportation shall be determined under this subsection.

Since Gross does not fall under new § 10701(f)(1)(A) because it has continued to operate during its bankruptcy, Gross argues that the reasonableness of its rates must be determined by the cost analysis of subsection § 10701(e). According to Gross, A.B. Dick's failure to allege that Gross' filed rates are unreasonable in accord with § 10701(e) means A.B. Dick's motion to stay the proceedings must be denied.

■ Gross overstates the Rates Act. The Rates Act establishes a framework for recovery of a percentage of the difference between the filed rates and actually-charged rates for shipments of various weights in order that these claims may be resolved without lengthy and expensive litigation. Rates Act, § 2(a), creating new § 10701(f). However, new § (f)(5) provides that shippers may still pursue existing remedies rather than pursuing those in the Rates Act. *Id.* The Rates Act supplements rather than replaces existing law. The House Report notes: "Existing law provides that shippers may assert, as a defense to an undercharge claim, the fact that the rate sought to be collected is unreasonable. H.R. 2121 preserves this alternative." House Report, 1993 WL 474910 at 28 U.S.Code Cong. & Admin.News 1993 at 2537.

■ In addition, neither § 2(g) nor any other section of the Rates Act addresses the threshold requirement for showing unreasonableness. Section 2(g) merely states that the reasonableness of rates shall be *determined* using the cost analysis method of § 10701(e). Thus, A.B. Dick has made the threshold requisite *showing* of unreasonableness.

### CONCLUSION

Defendant A.B. Dick's motion to stay these proceedings is granted. This action is stayed for 90 days to permit A.B. Dick to obtain a ruling by the Interstate Commerce Commission as to the reasonableness of plaintiff Gross Common Carrier's filed tariff rates. This case is set for a status report on March 22, 1994. The parties are to submit a joint written status report to chambers by March 18, 1994.