**In re L. Lou ALLEN, Trustee on Behalf of the Bankruptcy Estate of TSC Express Co., Debtor.**

**L. Lou ALLEN, Trustee on Behalf of the Bankruptcy Estate of TSC Express Co., Plaintiff,**

v.

**KRUEGER RINGIER, INC., Defendant.**

Bankruptcy No. 91 B 69474.
Adv. No. 93 A 550.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Oct. 24, 1994.

522

---

## MEMORANDUM OPINION

DAVID H. COAR, Bankruptcy Judge.

The matters before the Court are the Plaintiff's Motion for Summary Judgment and the Defendant's Cross Motion for Partial Summary Judgment and for Stay of Proceedings and Referral to the Interstate Commerce Commission ("Commission"). The Plaintiff, L. Lou Allen, trustee on behalf of the bankruptcy estate of TSC Express Co. ("Trustee"), seeks to recover freight charges for transportation services provided to the Defendant, Krueger Ringier, Inc. ("KRI"). KRI contends that a portion of the transportation services provided were outside the scope of TSC Express Co's ("TSC") statutory authority, therefore any recovery for such services would be inappropriate. For the remaining services, KRI seeks a referral to the Commission for a determination on whether the Trustee has acted reasonably in attempting to recover the freight charges and whether the charges sought are reasonable. Pending a resolution of these issues by the Commission, KRI seeks a stay of this proceeding. The Court, having considered the memoranda of law and affidavits submitted by the parties, now rules as follows.

## FACTS

On May 14, 1991, TSC filed its petition for bankruptcy under chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 101–1330. Prior to filing for bankruptcy, TSC operated as a motor common carrier trucking company, authorized to and actually doing business in interstate commerce pursuant to 49 U.S.C. §§ 10101–11917, and the rules and regulations of the Commission. In addition, TSC operated as an intrastate trucking company pursuant to Georgia law.

During the period between May 16, 1988 and September 15, 1989, TSC, as a motor common carrier, transported certain goods and/or merchandise from and to various locations of KRI. After delivering the products to KRI, TSC billed KRI for its services at the rate agreed upon by the two parties. Shortly thereafter, KRI paid these invoices in full. But, TSC never filed a copy of the negotiated price agreement with the Commission, in contravention to 49 U.S.C. § 10764. Subsequently, TSC ceased transporting property and filed its petition for bankruptcy relief.

The Trustee, with the prior approval of the bankruptcy court, contracted for an audit of all TSC freight bills for the three years prior to bankruptcy in order to determine the difference between the rates filed by TSC with the Commission and the rates that TSC had negotiated and billed KRI. (In numerous prior cases with similar facts, this difference has been referred to as the "undercharge".) Based on the audit results, the Trustee billed KRI $12,299.11 for undercharges. KRI has refused to pay, and the Trustee now seeks to recover the undercharges, pre-judgment interest of $2,938.73, and any other costs.

KRI contends that TSC acted outside the scope of its statutory authority for certain intrastate shipments, representing $8,545.50 of the total undercharges. A motor common carrier in the state of Georgia is required to impose the rates that they have filed with the Georgia Public Service Commission ("GPSC"). Ga.Code Ann. §§ 46–7–18 and –19 (Michie 1992). KRI alleges that TSC did not file their rates in a manner that conforms with this requirement.

Accordingly, TSC's failure to file their tariffs with the GPSC constitutes a violation of Georgia law., entitling KRI to summary judgment. With respect to the remaining undercharges, KRI asserts that the Trustee's attempt to collect the undercharges constitutes an "unreasonable practice", as defined by 49 U.S.C. § 10701, as amended by the Negotiated Rates Act of 1993, and that the rate the Trustee seeks to recover is unreasonably high. Therefore, KRI requests that this Court stay this proceeding pending a determination by the Commission regarding both the reasonableness of the Trustee's attempt to collect the undercharge and the reasonableness of TSC's rates filed with the Commission.

## BACKGROUND

■ The Commission regulates interstate transportation by motor common carriers to ensure that rates assessed for transportation services provided by motor common carriers are both reasonable and not discriminatory. *Maislin Industries, U.S. Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 119, 110 S.Ct. 2759, 2762, 111 L.Ed.2d 94 (1990); 49 U.S.C. §§ 10101(a), 10701(a), 10741(b). The only rates that motor common carriers may charge are those that have been filed with the Commission. 49 U.S.C. §§ 10761, 10762. This requirement, known as the "filed rate doctrine", has been strictly adhered to by the courts. *Reiter v. Cooper,* — U.S. —, —, 113 S.Ct. 1213, 1216, 122 L.Ed.2d 604 (1993); *Maislin,* 497 U.S. at 128, 110 S.Ct. at 2766; *Louisville & Nashville R.R. Co. v. Maxwell,* 237 U.S. 94, 96, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915). Any rate not filed with the Commission, even one negotiated and agreed upon by the parties, is unenforceable. *Maislin,* 497 U.S. at 127, 110 S.Ct. at 2766.

■ However, the filed rate must be reasonable in order to be enforceable. *Maislin,* 497 U.S. at 128, 110 S.Ct. at 2766; *Maxwell,* 237 U.S. at 96, 35 S.Ct. at 495. The Commission may investigate the reasonableness of a rate "on its own initiative or on a complaint." 49 U.S.C. § 11701(a). Upon declaring a rate unreasonable, the Commission has the power to prescribe the rate to be charged and hold the motor common carrier liable for damages for the imposition of an unreasonable act. *Maislin,* 497 U.S. at 119–20, 110 S.Ct. at 2762; 49 U.S.C. §§ 10704(b)(1), 11705(b)(3).

Since the deregulation of the trucking industry, pursuant to the enactment of the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793, motor common carriers have frequently negotiated rates with its shippers and then neglected to file these rates with the Commission. *Reiter,* — U.S. at —, 113 S.Ct. at 1216. Shippers reasoned that carriers would not enforce its filed rates because of the high price elasticity of the deregulated motor common carrier industry. *Overland Express, Inc. v. Interstate Commerce Comm'n,* 996 F.2d 356, 357 (D.C.Cir.1993). However, the shippers failed to foresee the effect that bankruptcy would have on the negotiated rates. After a motor common carrier filed for bankruptcy, its trustee, without the threat of marketplace competition, has the incentive to pursue an action against the shipper for the difference between the rate filed with the Commission and the negotiated rate (the undercharge). *Id.*

By the mid–1980's, these undercharge suits had become common. The shippers felt that such conduct by the bankruptcy trustees was inequitable and petitioned the Commission for relief. *Id.* The Commission agreed with the shippers and attempted to rectify the situation. *See, National Indus. Transp. League,* 3 I.C.C.2d 99, 104, 108 (1986) (Negotiated Rates I); *Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates,* 5 I.C.C.2d 623, 628–34 (1989) (Negotiated Rates II). However, the Supreme Court, strictly construing the filed

rate doctrine, rejected any attempts by the Commission to stray from the doctrine in undercharge actions. *Maislin,* 497 U.S. at 127, 110 S.Ct. at 2766. Despite the inequities involved, the shipper was still required to pay the filed rate, even though they had negotiated a lower rate with its carrier. *Id.*

After *Maislin* [1], the shippers' standard defense in an action to collect freight undercharges is that the filed rate is unlawful because it is unreasonably high. *Id.* In *Reiter,* the Court held that the shippers' defense was not a defense but instead a counterclaim under 49 U.S.C. § 11705(b)(3). *Reiter,* —— U.S. at ——, 113 S.Ct. at 1220. However, the question remains as to which entity shall make the initial determination of the reasonableness of the rate, the bankruptcy court or the Commission. Previously, some courts have stayed their proceedings upon the mere allegation that the filed rate was unreasonable [2], while other courts have required the shipper to make a "threshold" showing that the filed rate was unreasonable [3] before referring the matter to the Commission.

In late 1993, the President signed the Negotiated Rates Act ("NRA"). Negotiated Rates Act of 1993, Pub.L. No. 103–180, 107 Stat. 2044 (Dec. 3, 1993). The NRA overturned *Maislin* to the extent that it codified a shippers' right to allege that a motor common carriers' attempt to collect an undercharge may constitute an "unreasonable practice" under 49 U.S.C. § 10701. Section 2(e) of the NRA provides in relevant part:

(e) ALTERNATIVE PROCEDURE FOR RESOLVING DISPUTES.—

(1) GENERAL RULE.—For purposes of section 10701 of title 49, United States Code, *it shall be an unreasonable practice for a motor carrier of property* (other than a household goods carrier) providing transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of such title, a freight forwarder (other than a household goods freight forwarder), or a party representing such a carrier or freight forwarder to attempt to charge or to charge for a transportation service provided before September 30, 1990, the difference between the applicable rate that is lawfully in effect pursuant to a tariff that is filed in accordance with chapter 107 of such title by the carrier or freight forwarder applicable to such transportation service and the negotiated rate for such transportation service if the carrier or freight forwarder is no longer transporting property between places described in section 10521(a)(1) of such title or is transporting property between places described in section 10521(a)(1) of such title for the purpose of avoiding the application of this subsection.

(2) JURISDICTION OF COMMISSION.—*The Commission shall have jurisdiction to make a determination* of whether or not attempting to charge or the charging of a rate by a motor carrier or freight forwarder or party representing a motor carrier or freight forwarder is an unreasonable practice under paragraph (1). If the Commission determines that attempting to charge or the charging of the rate is an unreasonable practice under paragraph (1), the carrier, freight forwarder, or party may not collect the difference described in paragraph (1) between the applicable rate and the negotiated rate for the transportation service. In making such determination, the Commission shall consider—

(A) whether the person was offered a transportation rate by the carrier or freight forwarder or party other than that

---

**1.** Prior to *Maislin,* shippers' argued that the trustees' attempt to collect the undercharge constituted an "unreasonable practice" under 49 U.S.C. § 10701. However, the Court, following the filed rate doctrine, precluded the shipper from challenging the motor common carrier's decision to collect the undercharge as an "unreasonable practice." *Maislin,* at 497 U.S. at 134–5, 110 S.Ct. at 2770; *Reiter,* —— U.S. at ——, 113 S.Ct. at 1216.

**2.** *In re Lifschultz Fast Freight Corp.,* 157 B.R. 397 (Bankr.N.D.Ill.1993); *Lewis v. H.B. Fuller,* 1993 WL 244992 (D.Kan.1993); *In re Lyons Transp. Lines, Inc.,* 159 B.R. 182 (Bankr.W.D.Pa.1993).

**3.** *Atlantis Express, Inc. v. Standard Transp. Serv., Inc.,* 955 F.2d 529 (8th Cir.1992); *Milne Truck Lines, Inc. v. Makita U.S.A., Inc.,* 970 F.2d 564 (9th Cir.1992).

legally on file with the Commission for the transportation service;

(B) whether the person tendered freight to the carrier or freight forwarder in reasonable reliance upon the offered transportation rate;

(C) whether the carrier or freight forwarder did not properly or timely file with the Commission a tariff providing for such transportation rate or failed to enter into an agreement for contract carriage;

(D) whether the transportation rate was billed and collected by the carrier or freight forwarder; and

(E) whether the carrier or freight forwarder or party demands additional payment of a higher rate filed in a tariff.

(3) STAY OF ADDITIONAL COMPENSATION.—When a person proceeds under this subsection to challenge the reasonableness of the practice of a motor carrier, freight forwarder, or party described in paragraph (1) to attempt to charge or to charge the difference described in paragraph (1) between the applicable rate and the negotiated rate for the transportation service in addition to those charges already billed and collected for the transportation service, the person shall not have to pay any additional compensation to the carrier, freight forwarder, or party until the Commission has made a determination as to the reasonableness of the practice as applied to the freight of the person against whom the claim is made.

(4) TREATMENT.—Paragraph (1) of this subsection is enacted as an exception, and shall be treated as an exception, to the requirements of sections 10761(a) and 10762 of title 49, United States Code, relating to a filed tariff rate for a transportation or service subject to the jurisdiction of the Commission and other general tariff requirements.

(5) NONAPPLICABILITY OF NEGOTIATED RATE DISPUTE RESOLUTION PROCEDURE.—If a person elects to seek enforcement of paragraph (1) with respect to a rate for a transportation or service, section 10701(f) of title 49, United States Code, as added by subsection (a) of this section, shall not apply to such rate. (emphasis added).

According to KRI, the NRA requires this Court to stay this proceeding pending the decision of the Commission relating to KRI's "unreasonable practice" allegation under the NRA.

On the other hand, the Trustee contends that the bankruptcy court maintains jurisdiction over causes of action filed by the debtor. In addition, the Trustee argues that the NRA is not applicable to bankrupt motor common carriers because it deprives the estate of an interest in property in violation of 11 U.S.C. § 541. For the reasons discussed below, the Court shall deny both the Plaintiff's Motion for Summary Judgement and the Defendant's Cross-Motion for Summary Judgment but, pursuant to the NRA, shall grant the Defendant's request to stay this proceeding pending a decision by the Commission with regard to the Defendant's unreasonable practice defense and its unreasonably high rates counterclaim.

## JURISDICTION

This matter is before the court pursuant to 28 U.S.C. § 157 and is referred here under Local District Rule 2.33. This court has subject matter jurisdiction and this is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

## STANDARDS FOR SUMMARY JUDGMENT

■ Rule 56(c) of the Federal Rules of Civil Procedure, which applies to bankruptcy adversary proceedings pursuant to Bankruptcy Rule 7056, states that a motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The primary purpose of summary judgment is to avoid unnecessary trials in cases where no material factual issues are in dispute. *Wainwright Bank & Trust Co. v. Railroadmens Fed.Sav. & Loan Ass'n,* 806 F.2d 146, 149 (7th Cir.1986).

The party moving for summary judgment has the burden of establishing the lack of a genuine issue of material fact. *In re Hart*, 130 B.R. 817, 822 (Bankr.N.D.Ind. 1991) (citing *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir. 1984) and *Korf v. Ball State Univ.*, 726 F.2d 1222, 1226 (7th Cir.1984)). The court must consider the entire record, and must draw all reasonable inferences and resolve all factual disputes in favor of the non-moving party. *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 693 F.Supp. 666, 669 (N.D.Ill.1988), *aff'd*, 877 F.2d 1333 (7th Cir. 1989).

If the moving party meets this burden, the non-moving party must then respond by setting forth specific facts which demonstrate the existence of a genuine issue for trial. Fed.R.Civ.P. 56(e); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). The party opposing summary judgment may not merely rest upon allegations and denials in the pleadings. Fed.R.Civ.P. 56(e). The court must grant summary judgment unless it finds that the party opposing the motion has presented sufficient evidence which, if believed, would allow a reasonable trier of fact to return a decision for the non-moving party. *Hart*, 130 B.R. at 822, (citing *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987)).

Thus, it is not enough for the non-moving party to establish the existence of a factual dispute. The facts must be material; they must have the potential to affect the outcome of the case under the applicable law. *Hart*, 130 B.R. at 822. While the court does not weigh the evidence presented with regard to a summary judgment motion, the court must assess the sufficiency of the evidence to support a verdict in light of the evidentiary standard of proof that applies to the issue(s) in the case at hand. *Id.* (citing *Valley Liquors*, 822 F.2d at 659).

### CROSS MOTIONS FOR SUMMARY JUDGMENT

When each side seeks summary judgment, that does not by itself indicate that there are no genuine issues of material fact. The Court must rule on each motion separately, applying applicable standards, in determining whether summary judgment would be appropriate. *ITT Indus. Credit Co. v. D.S. America, Inc.*, 674 F.Supp. 1330, 1331 (N.D.Ill.1987); *In re Woodstock Associates I, Inc.*, 120 B.R. 436, 442 (Bankr.N.D.Ill. 1990). The court can deny both motions if both parties fail to meet their burden. *Wolf v. Maryland Casualty Co.*, 617 F.Supp. 456, 458 (S.D.Ill.1985). See 10A C. Wright, A. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (2d Ed.1983 & Supp. 1987).

### DISCUSSION

**I. The Interstate Commerce Commission's Authority to Determine What Constitutes an Unreasonable Practice Under § 10701.**

The preliminary issue to be resolved is the question of jurisdiction. As KRI correctly asserts, the NRA is not jurisdictional, it merely defines the actions that may be brought under the Interstate Commerce Act. Section 9 of the NRA provides that:

> Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy; title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts).

The legislative history clearly supports the position that the bankruptcy court retains its jurisdiction in matters related to bankrupt motor common carriers. *See,* 139 Cong.Rec. H9593–02, H9597, H9598, H9603 (daily ed. Nov. 15, 1993) (statements of Reps. Schuster, Petri, Mineta, and Brooks) (the NRA does not affect the jurisdiction of the courts of the United States, including bankruptcy courts, to determine any matter regarding a bankrupt motor carrier, other than determinations statutorily required by the NRA to be resolved by the Commission); 139 Cong.Rec. E2928–01 (daily ed. Nov. 17, 1993) (letter

confirming that the NRA does not affect either the Bankruptcy Code or the jurisdiction of the bankruptcy courts from Representative Mineta, Chairman of the Committee on Public Works and Transportation, to Representative Jack Brooks, Chairman of the Committee of the Judiciary). Clearly, Congress did not intend the NRA to affect the jurisdiction of the bankruptcy courts.

■■■ KRI is requesting that this court stay this proceeding pending a determination by the Commission as to whether the Trustee has engaged in an unreasonable practice as defined by § 2(e)(1) of the NRA.[4] KRI contends that, after the enactment of the NRA, this determination is within the sole jurisdiction of the Commission. The Court concurs that the Trustee's conduct in the current case meets the requirements of § 2(e)(1) of the NRA and is of the very nature that Congress intended the Commission to determine when they passed the NRA.

The majority of cases submitted to the this court addressing the jurisdictional question support the Court's conclusion. *Jones Truck Lines v. AFCO Steel, Inc.,* 849 F.Supp. 1296, 1301, 1306 (E.D.Ark.1994) (Since Jones is no longer transporting property, as a result of the NRA, the Commission has jurisdiction to determine whether the plaintiff's conduct in attempting to collect undercharges constitutes an unreasonable practice); *Jones Truck Lines, Inc. v. Alliance Rubber Co.,* 166 B.R. 691 (W.D.Ark.1994) (Order Granting Motion For Reconsideration); *But see, In re Bulldog Trucking, Inc.,* 1994 WL 835073, 1994 Bankr. LEXIS 217 (Bankr.W.D.N.C. Feb. 17, 1994) (by its terms, the NRA does not affect the jurisdiction of the bankruptcy court with respect to any matter).

The Trustee, as the party representing a freight carrier who is no longer transporting property, has charged and is attempting to collect the difference between the rate filed with the Commission and the rate that they negotiated with KRI for transportation services provided before September 30, 1990. As the statutory requirements of the NRA have been fulfilled, the Commission has the jurisdiction to make the initial determination of whether the Trustee's attempt to collect this undercharge constitutes an unreasonable practice. NRA, § 2(e)(2).

The court acknowledges that its conclusion is in contravention to that expressed by the Court in *In re Bulldog Trucking, Inc.,* 1994 WL 835073, 1994 Bankr. LEXIS 217 (Bankr. W.D.N.C.1994). In *Bulldog,* the court concluded that the NRA is "applicable nonbankruptcy law" that causes a forfeiture, modification or termination of property rights of a debtor in bankruptcy based in its financial condition, in violation of § 541(c)(1)(B). *Bulldog Trucking,* 1994 WL 835073 at *7–8, 1994 Bankr. Lexis 217 at *23. As a result, the court declared that the NRA has no effect on the right of a bankrupt motor common carrier to collect any applicable undercharges. To the extent that the court in *Bulldog* concludes that the NRA does not apply to bankrupt motor common carriers, this Court respectfully disagrees.

First, the interpretation of the phrases "motor carrier of property" and "no longer transporting property" is contrary to both the Supreme Court's and the Seventh Circuit's requirement that a statute be interpreted according to its plain meaning. *Ardestani v. I.N.S.,* 502 U.S. 129, 135, 112 S.Ct. 515, 520, 116 L.Ed.2d 496 (1991) (where a statute is clear on its face, its plain meaning should be obeyed); *Welsh v. Boy Scouts of America,* 993 F.2d 1267, 1270 (7th Cir.), *cert.*

4. Many previous courts addressing the filed rate doctrine have debated whether they should "refer" the issue of rate reasonableness to the Commission for a determination of whether the filed rate was reasonable. However, the Interstate Commerce Act provides no mechanism for a court to refer any matter to the Commission. *Reiter,* —— U.S. at —— n. 3, 113 S.Ct. at 1220 n. 3; *Gross Common Carrier, Inc. v. A.B. Dick Co.,* 861 F.Supp. 638, 639 n. 1 (N.D.Ill.1993).

Instead, if proper, the court should grant KRI's motion to the stay this proceeding while KRI

files an administrative complaint under 49 U.S.C. § 11701(b) with the Commission. *Reiter,* —— U.S. at —— n. 3, 113 S.Ct. at 1220 n. 3; *Gross,* 861 F.Supp. at 639 n. 1. The Commission may then review the complaint under § 2(e)(2) of the NRA. Regardless, referral of an issue to an administrative agency does not deprive the court of jurisdiction, it has jurisdiction to retain the case or dismiss the case, without prejudice, if the parties would not be unfairly disadvantaged. *Reiter,* —— U.S. at ——, 113 S.Ct. at 1220.

*den.,* —— U.S. ——, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993); *U.S. v. Shriver,* 989 F.2d 898, 901 (7th Cir.1992).

The Court in *Bulldog Trucking* reaches its conclusion by rewriting NRA § 2(e)(1) to read "a motor carrier that is no longer generating revenues from current transportation of property." *Bulldog Trucking,* 1994 WL 835073 at *10–11, 1994 Bankr. LEXIS 217, *34. This attempt to evade the actual wording of the NRA ignores the NRA's plain meaning and directly contradicts Congress' intent to resolve the undercharge crisis.

The enactment of the NRA clearly reflects a policy decision by Congress to promote a uniform body of law as to what constitutes an "unreasonable practice" under § 10701 of the Interstate Commerce Act. If there were any doubt as to Congress' intent, both the comments of the President and the legislative history resolves such doubt. When signing the NRA, President Clinton announced that he had signed a bill aimed at preventing bankruptcy trustees from billing trucking customers for the difference between the rates paid and the official, or filed, rates. *White House Clears Negotiated Rates Act, Covering Truck Fees,* Wall St. J., Dec. 6, 1993, at B7D.

Representative Schuster stated that "the undercharge crisis has been caused by certain trustees of bankrupt trucking companies repudiating the trucking company's own rates for past transportation services, and then trying to benefit from this unseemly conduct in a bankruptcy proceeding." 139 Cong.Rec. H9596 (daily ed. Nov. 15, 1993) (statement of Rep. Schuster). The Congressman continued on to state that the passage of the NRA will end an inequitable situation where honest, hardworking companies are being gouged by overzealous bankruptcy trustees through a simple loophole in the law. *Id.* at H9597.

Finally, when addressing the affect of the NRA on the bankruptcy court, Congress strongly stated that with regard to any matter covered by the NRA, the bankruptcy court has the obligation to refer any of these determinations to the Commission, that this obligation is mandatory and not discretionary. 139 Cong.Rec. at H9597, H9598, 9602, 9603 (daily ed. Nov. 15, 1993) (statements of Reps. Schuster, Petri, Mineta, and Brooks).

Although this legislation was only recently passed, several courts which have confronted the issue have found that Congress clearly intended the NRA to apply to bankrupt motor carriers. *AFCO Steel,* 849 F.Supp. at 1301; *Jones Truck Lines, Inc. v. Kelly Foods, Inc.,* No. 93–2487, 1994 WL 121764 (W.D.Tenn. Jan. 10, 1994) (Order Granting Motion to Reconsider and Referral of the Contract Carriage Issue to the Commission) (specifically disagreeing with *In re Bulldog*); *Jones Truck Lines, Inc. v. Aladdin Synergetics, Inc.,* 174 B.R. 76, 80, (M.D.Tenn.1994) (characterizing the trustee's interpretation that the NRA does not apply to bankrupt carriers on jurisdictional grounds as "absurd and patently at odds with Congress' intent in enacting the NRA")[5].

This court shall not heed the Trustee's invitation to depart from the plain meaning of the NRA on jurisdictional grounds, especially in light of the legislative history of the NRA. The Trustee's remaining argument is that the NRA nullifies 11 U.S.C. § 541(c)(1). The relevant portion of 11 U.S.C. § 541(c)(1) states:

(c)(1) Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—

(A) that restricts or conditions transfer of such interest by the debtor; or

(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title

---

**5.** Additional decisions that have applied the NRA to bankrupt motor carriers include: *Jones Truck Lines, Inc. v. Acme Frame Products, Inc.,* No. J–C–93–197, 1994 WL 408746 (W.D.Ark. Jan. 11, 1994); *Jones Truck Lines, Inc. v. Chattem, Inc.,* No. 1:03–cv–281, 1994 WL 525877 (E.D.Tenn. Jan. 31, 1994); *Jones Truck Lines, Inc. v. Admiral Marine Co., Inc.,* 858 F.Supp. 71 (E.D.La.1994).

or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

While the right to recover freight bills constitutes an interest in property within the realm of § 541, *In re Transcon Lines,* 147 B.R. 770 (Bankr.C.D.Cal.1992), the NRA does not effect a forfeiture of that interest under § 541(c)(1)(B).

Neither the term "property" nor the term "interest in property" is defined by the Bankruptcy Code. 4 King, *Collier on Bankruptcy,* ¶ 541.02(1) at 541–10.1, 541–11 (15th ed. 1993). Instead, these terms are defined by nonbankruptcy law. *Id.* There is nothing in the legislative history which suggests that § 541 is all encompassing. *In re Chicago, Missouri and Western Ry. Co.,* 156 B.R. 567, 574 (Bankr.N.D.Ill.1993). In addition, *Collier* notes that:

> the bankruptcy system functions within the larger context of the federal system, complete independence from nonbankruptcy law is not possible. Section 541 of the Code, as did Section 70 of the Bankruptcy Act, provides a system for dealing with the debtor's interest in property an his debts. However, the existence and nature of the debtor's interest in property, and of his debts, are determined by nonbankruptcy law.

*Collier,* ¶ 541.02, at 541–10–1.

■ Section 541 merely defines what interests of the debtor are transferable to the estate. *In re Farmers Markets,* 792 F.2d 1400, 1402 (1986). It does not address the threshold questions of the existence and scope of the debtor's interest in a given asset. *Id.* Under the Code, these questions are resolved by reference to nonbankruptcy law. *Id.* (citations omitted). The court in *Bulldog* distinguishes this case by stating that, unlike the NRA, the property restriction in *Farmers Markets* was not conditioned on the financial condition of the debtor. *Bulldog,* 1994 WL 835073 at *13, 1994 Bankr. LEXIS at *44. However, as will be discussed below, *Bulldog's* characterization of the NRA as nonbankruptcy law based on the

financial condition of the debtor is unsubstantiated.

■ The right to recover an undercharge is an offspring of the filed rate doctrine, which is a creature of the Interstate Commerce Act ("ICA"). 49 U.S.C. § 10761, 10762. Accordingly, any property right that a bankruptcy trustee may have in collecting an undercharge is limited by the act which created the property right, in the instant case, the ICA. In other words, any property rights that Congress may have provided when they enacted the ICA may be repealed or rescinded by amending the ICA. The Supreme Court recognized as much when upholding the filed rate doctrine, stating that "if strict adherence to §§ 10761 and 10762 as embodied in the filed rate doctrine has become an anachronism in the wake of the MCA (Motor Carrier Act of 1980), it is the responsibility of Congress to modify or eliminate these sections." *Maislin,* 497 U.S. at 135, 110 S.Ct. at 2770.

■ In passing the NRA, Congress, although not altering either § 10761 or § 10762, ameliorated the harshness of failing to comply with these sections by modifying § 10701 in the event that there is a negotiated rate between a shipper and a motor common carrier. When the requirements of the NRA are satisfied, the debtors', or the bankruptcy trustees' or any other party's property interest in collecting an undercharge is subject to a determination by the Commission that such attempt does not constitute an unreasonable practice. NRA, § 2(e)(1).

■ In addition, while the NRA constitutes applicable nonbankruptcy law, *Patterson v. Shumate,* 504 U.S. 753, 756, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992) (applicable nonbankruptcy law includes federal statutory law), it does not effect or give an option to effect a forfeiture, modification, or termination of the debtor's interest in property based on its financial condition under 11 U.S.C. § 541(c)(1)(B).

In *Bulldog,* the court cites various cases that allegedly support its conclusion that the NRA is nonbankruptcy law that contradicts 11 U.S.C. § 541(c)(1)(B). However, the cases cited in *Bulldog* all represent attempts by either the parties to a contract or by the state to evade the wide coverage of 11 U.S.C.

§ 541 or the similar provisions of 11 U.S.C. § 363. This Court does not contend that line of cases. However, in the instant case, neither an *ipso facto* clause written by one of the parties nor a state law is at issue. Instead, Congress, acting within its powers, has chosen to redefine what constitutes a property interest under the ICA.

 Despite contentions in *Bulldog* to the contrary, the NRA does not conflict with § 541 as it is not triggered by the financial condition of the debtor, an essential and necessary requirement of § 541(c)(1)(B). The NRA applies when a carrier is no longer transporting property between the places described in § 10521(a)(1) of this title. NRA, § 2(e)(1). This criteria is separate and distinct from a requirement that depends on the financial status of the debtor. *AFCO Steel,* 849 F.Supp. at 1304; *Aladdin Synergetics, Inc.,* 174 B.R. at 81, n. 9. The essential distinction is that the forces of the marketplace and the incentive to maintain good business relations will restrain operating carriers from making unfounded or tenuous undercharge claims, but there is no such check on nonoperating carriers. *AFCO Steel,* 849 F.Supp. at 1304, *citing,* United States' Suggestion of Interest, Memorandum by United States Department of Justice, filed in response to the recommended order in *Bulldog Trucking* pending before the U.S. District Court, W.D., N.C. Charlotte Division.

The financial condition of the debtor is only one reason why a motor carrier may cease transporting property. The NRA would apply in various other circumstances, including when a conglomerate decides to leave the motor common carrier industry or when the owner of a company decides to retire and close up shop. On the other hand, the NRA would *not* apply to a motor common carrier in bankruptcy and still transporting property. The NRA does not contain the phrase "financial condition" or any similar phrase. Although the NRA is applicable nonbankruptcy law, it is not conditioned on the financial condition of the debt-

or. Therefore, the NRA does not violate § 541(c)(1)(B).

 The interpretation of the NRA by the court in *Bulldog* also ignores several basic rules of statutory construction. First, where possible statutes must be read so as to give meaning to each statute and should be construed in harmony, rather than conflicting with each other. *In re Hill,* 156 B.R. 998, 1007 (Bankr.N.D.Ill.1993), *citing, In re Johnson,* 787 F.2d 1179, 1181 (7th Cir.1986). Next, to the extent that the two statutes may conflict, this court will adhere to the general rule of following the statute enacted last in time, as that is the most recent expression of the legislature's will. *Boudette v. Barnette,* 923 F.2d 754, 757 (9th Cir.1991); *Hellon & Assoc. Inc. v. Phoenix Resort Corp.,* 958 F.2d 295, 297 (9th Cir.1993); *AFCO Steel,* 849 F.Supp. at 1305. Moreover, when Congress enacts a new statute, courts presume that the legislators considered previous laws and passed the later law in harmony with the policy embodied in the earlier statute, in the absence of any express repudiation or modifications. *AFCO Steel,* 849 F.Supp. at 1304–06, *citing, Hellon* at 297. Finally, the foremost principle of statutory construction "is to construe the language as to give the effect to the intent of Congress." *Aladdin Synergetics,* 174 B.R. at 80, *citing, United States v. Underhill,* 813 F.2d 105, 111 (6th Cir.), *cert. den.,* 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987).

As discussed above, Congress clearly intended that the NRA apply to bankrupt motor carriers. In addition, the NRA does not conflict with § 541 as the NRA is not conditioned on the financial condition of the debtor. Finally, the NRA represents the most recent expression of Congress' intent to resolve the undercharge crisis with respect to bankrupt motor carriers.[6] Therefore, this Court will follow the mandate of the NRA and stay these proceedings pending the resolution of KRI's administrative complaint filed with the Commission.[7]

6. Section 541 was promulgated under Pub.L. 95–598, Nov. 6, 1978, 92 Stat. 2594.

7. The Trustee, in his Surreply to Defendant's Reply to Plaintiff's response to Defendant's Mo-

tion for Summary Judgment, admits that KRI may pursue settlement of its claim or obtain referral to the Commission by the Court upon reasonableness of a rate or practice.

## II. The Interstate Commerce Commission's Authority to Determine What Constitutes an Unreasonable Rate Under § 10701.

Although the NRA does not directly address the issue of what constitutes an unreasonable rate, it indirectly resolves the issue of whether a party must make a threshold showing in order to convince the court to refer, or more appropriately, to stay, a proceeding to determine whether a rate was reasonable, at least when applied to negotiated rate cases.[8] The issues of the reasonableness of the Trustee's attempt to collect any undercharge and that of the reasonableness of the filed rate are so intertwined that the most appropriate action is to stay this proceeding until the Commission can make a determination on both issues. *The Coca–Cola Co. v. The Atchison, Topeka, and Santa Fe Ry. Co.*, 608 F.2d 213, 219–20 (5th Cir. 1979).

When the requirements of the NRA are satisfied, it makes little sense to stay a proceeding on account of an unreasonable practice allegation and continue the same proceeding until a party makes a threshold requirement that the filed rate that the Trustee is attempting to collect is unreasonable. Under the NRA, in order to obtain a stay of the bankruptcy proceedings and bring the case within the jurisdiction of the Commission, a shipper need only show that the NRA requirements are satisfied and that the carrier is attempting to collect an undercharge.

## III. The Applicability of the Intrastate Tariffs.

In Georgia, motor common carriers are required to charge the rates that they have filed with the GPSC. Ga.Code Ann. § 46–7–18 and 19 (Michie 1992). The Trustee alleges that various undercharges relate to intrastate shipments. KRI contends that there are not any applicable intrastate tariffs on file in Georgia. KRI maintains that TSC did not travel on the routes specified in the tariff application on file with the GPSC. Accordingly, KRI asserts that any rates on file would not apply to them. Subsequent to KRI's assertion of this defense, TSC provided KRI with documentation that indicates that the routes travelled when servicing KRI were covered by the tariffs on file. KRI has not responded to this most recent affidavit. Whether an appropriate tariff was on file at the GPSC is a genuine issue of material fact. As a result, it would not be appropriate at this time to grant KRI's Motion for Partial Summary Judgment.

## CONCLUSION

The Court shall deny both the Plaintiff's Motion for Summary Judgement and the Defendant's Cross–Motion for Summary Judgement. The Court shall grant KRI's request to stay these proceedings for a reasonable period pending the resolution of KRI's administrative complaint with the Commission. This period shall not exceed one year without further order by this Court.

---

Given this acknowledgement, it would be a waste of judicial resources for this court not to stay this proceeding, especially in light of the promulgation of the NRA. The Trustee does not explain why this case should be heard twice, first in front of this Court and then in front of the Commission.

